HONORABLE DAVID NORIEGA RODRÍGUEZ, ETC., demandantes y apelantes, *v.* HONORABLE JOSÉ RONALDO JARABO, ETC., demandados y apelados.

*Número:* AC-92-97 *Resuelto:* 24 de junio de 1994

500

*Juan Santiago Nieves, José Juan Nazario de la Rosa,* de *Nazario & Santiago,* abogados de los demandantes y apelantes; *Roberto Ariel Fernández, Marcos A. Ramírez Lavandero,* de *Ramírez & Ramírez, y Richard W. Markus,* abogados de los demandados y apelados.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión del Tribunal.

En el presente caso debemos resolver si la Regla XXXIII del Reglamento de la Cámara de Representantes, 1982, pág. 71, viola las prerrogativas legislativas de los miembros de dicho Cuerpo, según delineadas por la Constitución del Estado Libre Asociado de Puerto Rico. La regla en cuestión estipula el procedimiento parlamentario para la abstención en las votaciones celebradas en la Cámara de Representantes.

## I

Los demandantes apelantes son los Lcdos. David Noriega Rodríguez e Hiram Meléndez Rivera, Representantes por Acumulación por el Partido Independentista Puertorriqueño (en adelante P.I.P.) en la Cámara de Representantes durante el cuatrienio 1988–1992.([1])

---

([1]) Al momento en que presentaron la demanda en el caso de autos, los demandantes apelantes, Lcdos. David Noriega Rodríguez e Hiram Meléndez Rivera, fungían como portavoces, en propiedad y alterno respectivamente, del Partido Independentista Puertorriqueño (en adelante P.I.P.) en la Cámara de Representantes. En la actualidad, el Hon. David Noriega Rodríguez continúa ocupando un escaño en la Cámara de Representantes y es el Portavoz del P.I.P. en dicho cuerpo legislativo. No así el Lcdo. Hiram Meléndez Rivera.

Los codemandados originales eran el Sr. José Ronaldo Jarabo, en su calidad de Presidente de la Cámara de Representantes, y el Lcdo. Ferdinand Mercado, en su carácter de Secretario de dicho cuerpo legislativo. De acuerdo con la Regla 22.4 de Procedimiento Civil, 32 L.P.R.A. Ap. III, los demandados han sido sustituidos por la Lcda. Zaida Hernández Torres y la Sra. Ángeles Mendoza, las actuales Presidenta y Secretaria de la Cámara de Representantes.

El 5 de marzo de 1990 la Cámara de Representantes llevó a votación varias Resoluciones Conjuntas de la Cámara y del Senado de Puerto Rico.(2) Mediante dichas resoluciones se asignaban partidas de dinero con cargo al llamado "barril de tocino" y a otros fondos públicos. Conforme a la Regla XXXIII, incisos 5–6, del Reglamento de la Cámara de Representantes, *supra*, la cual estipula el procedimiento para abstenerse durante una votación cameral,(3) los Representantes Noriega Rodríguez y Meléndez Rivera solicitaron permiso para abstenerse en dicha votación.

Explicaron que no deseaban votar porque la aprobación de resoluciones conjuntas inespecíficas con cargo al "barril de tocino" y a otros fondos públicos era inconstitucional, de acuerdo con la sentencia del Tribunal Superior, Sala de San Juan, en el caso *Noriega v. Hernández Colón*, 135

---

(2) Resoluciones Conjuntas de la Cámara Núms. 1538, 1546, 1547, 1549, 1552, 1556, 1560, 1565, 1572, 1578, 1589, 1590, 1592, 1625 de 5 de marzo de 1990. Resoluciones Conjuntas del Senado Núms. 803, 994, 1019, 1023, 1024, 1025, 1029, 1030, 1040, 1050, 1052 de 5 de marzo de 1990.

(3) La Regla XXXIII, incisos 5 y 6 del Reglamento de la Cámara de Representantes, 1982, págs. 72–73, dispone:

"5. Todo representante estará obligado a emitir su voto en los asuntos sometidos a votación y si tiene en ellos interés personal directo deberá abstenerse de votar. Podrá abstenerse con el consentimiento mayoritario de la Cámara, por razones de alta trascendencia moral o cuando no esté preparado, por desconocimiento del asunto en discusión, para emitir su voto.

"6. La Cámara a solicitud de cualquier Representante, resolverá sin debate cuándo una cuestión debe ser considerada de alta trascendencia moral, una vez explicada ésta por el Representante."

D.P.R. 406 (1994) .([4]) Indicaron que dicha sentencia había sido apelada ante este Foro y que aún no se había resuelto la misma. Por último, alegaron que la vaguedad del texto de las resoluciones no les permitía formar un juicio inteligente para votar.

En la primera votación, a viva voz, la Cámara de Representantes autorizó la abstención de los codemandantes.([5]) Sin embargo, luego de la división del cuerpo legislativo, dicha autorización les fue denegada.([6]) Al pase de lista, en votación final, los codemandantes intentaron emitir y explicar sus votos de abstención.([7]) El Presidente accidental

---

([4]) El Tribunal Superior, Sala de San Juan, dictó sentencia declarando inconstitucionales las Resoluciones Conjuntas Núm. 94 de la Cámara de Representantes y Núm. 111 del Senado de 17 de agosto de 1989 (conocidas como el "barril de tocino"), así como aquellas similares aprobadas en años anteriores. El tribunal de instancia entendió que el esquema de distribución de fondos de dichas resoluciones: (1) violenta el principio de separación de poderes, ya que constituye una intromisión indebida del legislativo en los atributos y deberes del ejecutivo y una tentativa de usurpación de los mismos, y (2) dificulta la fiscalización del uso de fondos públicos, propiciando el mal uso de éstos. El tribunal emitió auto de *injuction* permanente contra el Administrador de la Administración de Servicios Municipales (A.S.M.) y le ordenó cumplir con las normas establecidas en su dictamen sobre cómo habrían de redactarse futuras resoluciones que asignaran fondos públicos.

Recientemente en *Noriega v. Hernández Colón*, 135 D.P.R. 406 (1994), confirmamos dicha sentencia.

([5]) En la votación a viva voz [las que no son por lista], los Representantes que desean abstenerse no necesitan solicitar y obtener la autorización de la Cámara. Regla XXXIII(6) del Reglamento de la Cámara de Representantes, *supra*.

([6]) La división del Cuerpo se utiliza para verificar las votaciones abiertas cuando algún miembro de la Asamblea la solicita o cuando el presidente tiene dudas sobre el resultado de una votación. R.B. Bothwell, *Manual de Procedimiento Parlamentario*, 2da ed. rev., Río Piedras, Ed. U.P.R., 1962, págs. 63–64.

Véase la Regla III(5) del Reglamento de la Cámara de Representantes, 1982, pág. 4, sobre la división de la Cámara:

"5. El Presidente someterá a la Cámara los asuntos que no requieran votación por lista, en esta forma: 'Los que estén por la afirmativa dirán 'sí' y los que estén por la negativa dirán 'no'.' Si no estuviese cierto del resultado de la votación o algún Representante pidiese la división de la Cámara, dispondrá que se pongan de pie: primero, los que estén por la afirmativa y después los que estén por la negativa."

([7]) En la Moción de Desestimación presentada por los demandados apelados se indica que, después de la primera votación sobre el asunto, el Representante Cepeda García solicitó que se dividiera la Cámara de Representantes con relación a la moción de permiso para abstenerse presentada por el demandante Noriega Rodríguez. Éste último expresó que ya se había decretado por la Presidencia la aprobación de su solicitud. El Representante Santiago García aclaró que tras decretarse el resultado de una votación a viva voz fue que se solicitó que el Cuerpo se dividiera; que la duda en cuanto a cómo se votó surgió del legislador que pidió la división del Cuerpo y, por

de la Cámara, Hon. Samuel Ramírez, instruyó al Secretario del Cuerpo a no contar los votos de los Representantes Noriega Rodríguez y Meléndez Rivera.

Así las cosas, los codemandantes apelantes presentaron una demanda de sentencia declaratoria e interdicto para que se declarara inconstitucional la Regla XXXIII del Reglamento de la Cámara de Representantes, *supra*, y se ordenara al Secretario de la Cámara a registrar en sus libros la abstención de los Representantes Noriega Rodríguez y Meléndez Rivera, respecto a la votación de las Resoluciones Conjuntas de la Cámara y del Senado.

El foro de instancia concedió un plazo de treinta (30) días a los demandantes para que utilizaran el mecanismo provisto por el Reglamento de la Cámara de Representantes para solicitar enmiendas al mismo.[8] Además, el tribunal de instancia se reservó la jurisdicción para resolver el pleito en sus méritos en caso de que la Cámara de Representantes se negara a entender en la solicitud de enmienda a este reglamento.

El 24 de octubre de 1990 los demandantes apelantes informaron al tribunal que el 29 de mayo de 1990 habían presentado una moción ante la Cámara de Representantes para enmendar el inciso 5 de la Regla XXXIII del Reglamento del cuerpo legislativo, *supra*, para que no se requiriese el consentimiento mayoritario de los miembros de la Cámara para abstenerse de votar y que ésta había sido referida a la Comisión de Asuntos Internos de la Cámara. Alegaron que dicha comisión no rindió informe alguno sobre la enmienda propuesta. Solicitaron la reanudación de

---

lo tanto, estaba en orden tal solicitud.

[8] La Regla XLII del referido reglamento, pág. 79, dispone que:

"1. Este Reglamento no podrá ser suspendido, modificado o enmendado, sino en virtud de moción al efecto presentada por escrito.

"Toda moción para suspender, modificar o enmendar este Reglamento será referida a la Comisión de Asuntos Internos de la Cámara, la cual deberá rendir su informe dentro de las setenta y dos (72) horas siguientes, a menos que su Presidente solicite u obtenga de la Cámara un término mayor para estudiar e informar las enmiendas propuestas. Cuando la enmienda sea propuesta por dicha Comisión, no será necesario referírsela nuevamente."

los procedimientos en el caso y la consideración de la Moción de Sentencia Sumaria.

El tribunal de instancia dictó sentencia el 9 de enero de 1992, desestimando la demanda. Resolvió que a la Cámara de Representantes le corresponde determinar si existen razones válidas para permitir la abstención de los demandantes. En síntesis el tribunal concluyó: (1) que la Regla XXXIII del Reglamento de la Cámara de Representantes, *supra*, establece una obligación de votar y una discreción en la abstención; (2) que el Art. 23 del Código Político, 2 L.P.R.A. sec. 23, impone a los oficiales y empleados de cada Cámara cumplir con las obligaciones que le son exigidas por los reglamentos u órdenes de los respectivos Cuerpos; (3) que el Art. III, Sec. 17, Const. E.L.A., L.P.R.A., Tomo 1, establece la obligación de los miembros de la Cámara a emitir un voto a favor o en contra y no provee para la abstención; (4) que el Reglamento de la Cámara de Representantes concede derechos más amplios que la Constitución al permitir las abstenciones de los legisladores, pero que éstos son condicionados; (5) que es tarea de la Cámara determinar y revisar las reglas legislativas, ya que a los cuerpos legislativos les corresponde adoptar sus reglas de gobierno interno para controlar sus procedimientos, y (6) que por la doctrina de cuestión política le corresponde a la Rama Legislativa y no a los tribunales intervenir en los asuntos internos de ésta.

Los Representantes Noriega Rodríguez y Meléndez Rivera apelaron la sentencia y presentaron dos (2) señalamientos de error. Alegaron, primero, que el tribunal de instancia erró al abstenerse en el caso de autos por razón de la doctrina de cuestión política. Segundo, que el tribunal de instancia incidió al no reconocer las garantías constitu-

cionales sobre el derecho del legislador a votar libremente.(⁹)

En resumen, el caso ante nos cuestiona la validez constitucional de una regla específica del Reglamento de la Cámara de Representantes. Por lo tanto, nos corresponde analizar si a la luz de los hechos de este caso, estamos ante una controversia justiciable; si tal como determinó el tribunal de instancia estamos ante una cuestión política, o si la alegada regla del Reglamento de la Cámara de Representantes violenta los derechos constitucionales de los demandantes. Veamos.

## II

■ Tras la histórica decisión del Tribunal Supremo de Estados Unidos en *Marbury v. Madison*, 5 U.S. 135 (1803),(¹⁰) es un axioma de la litigación constitucional que el Poder Judicial tiene facultad para revisar y determinar la constitucionalidad de las actuaciones de las otras ramas

---

(⁹) Tras la presentación del recurso de apelación ante nos, han ocurrido otros eventos relacionados al caso. Por una parte, el 25 de enero de 1994 los demandantes apelantes presentaron una Moción en Auxilio de Jurisdicción. Alegaron que el Representante Noriega Rodríguez, así como otros legisladores, solicitaron autorización del cuerpo legislativo para abstenerse durante el proceso de votación final de la Resolución Concurrente Núm. 14 (sustitutiva). Dicha petición fue denegada. Al llamarse en votación por lista al compareciente Representante Noriega Rodríguez, éste manifestó su abstención. La actual Presidenta de la Cámara de Representantes, Hon. Zaida Hernández Torres, ordenó que la abstención se anotara como un voto en contra de la medida legislativa y presentó una querella contra el legislador aquí demandante apelante. En la Querella de 12 de enero de 1994 se hace mención de varios representantes que "no obstante habérsele denegado el permiso para su abstención, [las partes querelladas] al ser llamadas para votar procedieron a verbalizar para récord su abstención" en violación a la Regla XXXIII del Reglamento de la Cámara de Representantes, *supra*. El Representante Noriega Rodríguez nos solicitó la paralización de los procedimientos ante la Comisión de Ética de la Cámara de Representantes mientras se dilucidaba la apelación en el caso de autos y que decretáramos la obligación de la Presidenta de la Cámara de Representantes y de la Secretaria del Cuerpo de reconocer, contar y registrar su voto de abstención.

Por otra parte, otro de dichos representantes, Hon. Alfonso López Chaar, el 26 de enero de 1994 presentó ante este Tribunal una Moción y Demanda de Intervención en el caso de autos. Denegamos ambas mociones.

(¹⁰) 2 L. Ed. 135 (1803).

de gobierno. Mas la revisión judicial tiene límites. Éstos fueron delineados por el Tribunal al interpretar el Art. III, Sec. 2 de la Constitución federal, L.P.R.A., Tomo 1, que limita el poder judicial de las cortes federales a casos y controversias.[11]

Recientemente en *Noriega v. Hernández Colón*, supra, reiteramos el concepto de "justiciabilidad" que acogimos en *E.L.A. v. Aguayo*, 80 D.P.R. 552, 595 (1958), en el cual determinamos que la revisión judicial es la "característica distintiva de nuestro orden político".[12] Expresamos que la autoridad de los tribunales para determinar si son o no justiciables los casos que ante ellos se plantean nace del principio fundamental de que los tribunales sólo existen para resolver "controversias genuinas surgidas entre partes opuestas que tienen interés real en obtener un remedio que haya de afectar sus relaciones jurídicas". *E.L.A. v. Aguayo*, supra, págs. 558–559.[13] La autolimitación judicial es necesaria porque constituye "un mínimo de condiciones para el ejercicio discreto y tolerable de un poder que de otro modo constituiría una clara amenaza para la calidad democrática del sistema y convertiría a los jueces en guardianes de la comunidad". Íd., pág. 597. La propia Constitución del Estado Libre Asociado, en su Art. V, Sec. 4, L.P.R.A., Tomo 1, ed. 1982, pág. 356, provee que "[n]inguna ley se declarará inconstitucional a no ser por una mayoría del número total de los jueces de que esté

---

[11] Sobre el concepto de "justiciabilidad" en la jurisdicción federal, véanse: J.E. Nowak, R.D. Rotunda y J.N. Young, *Constitutional Law*, 3ra ed., Minneapolis, Ed. West Pub. Co., 1986, págs. 55–110; L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, págs. 67–155.

[12] Los conceptos generales de justiciabilidad en el Derecho Puertorriqueño son discutidos en R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. I, págs. 97–205. Véase, además, H.N. Padilla, *El poder judicial en Puerto Rico: su estructura, funciones y limitaciones*, 50 Rev. Jur. U.P.R. 357, 401–451 (1981).

[13] Véanse: *El Vocero v. Junta de Planificación*, 121 D.P.R. 115 (1988); *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986); *Pan Ame. Comp. Corp. v. Data Gen. Corp.*, 112 D.P.R. 780 (1982); *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715 (1980); *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977).

compuesto el tribunal", lo que demuestra que los miembros de la Convención Constituyente tuvieron "plena conciencia de la 'gravedad y delicadeza' de esta función judicial y actuó [la convención] para limitarla aún más de lo que voluntariamente lo han hecho los tribunales federales". *E.L.A. v. Aguayo*, supra, pág. 599. Las doctrinas de autolimitación, conocidas como "opinión consultiva",([14]) "capacidad jurídica",([15]) "madurez",([16]) "academicidad"([17]) y "cuestión política"([18]) forman el armazón del concepto de "justiciabilidad". Ahora bien, dichas doctrinas son autoimpuestas. Son los propios tribunales quienes analizan y deciden si deben entender en un determinado caso sin rebasar el límite de su poder constitucional. *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715, 720–721 (1980).([19])

---

([14]) *Noriega v. Hernández Colón*, supra; *Schmidt Monge v. Torres*, 115 D.P.R. 414 (1984); *Com. de la Mujer v. Srio. de Justicia*, supra; *Pérez v. Autoridad Fuentes Fluviales*, 87 D.P.R. 118 (1963); *E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958).

([15]) *Noriega v. Hernández Colón*, supra; *Hernández Torres v. Gobernador*, 129 D.P.R. 824 (1992); *Col. Ópticos de P.R. v. Vani Visual Center*, 124 D.P.R. 559 (1989); *Silva v. Hernández Agosto*, supra; *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407 (1982); *Fund. Arqueológica v. Depto. de la Vivienda*, 109 D.P.R. 387 (1980); *Com. de la Mujer v. Srio. de Justicia*, supra; *Salas Soler v. Srio. de Agricultura*, 102 D.P.R. 716 (1974).

([16]) *Noriega v. Hernández Colón*, supra; *El Vocero v. Junta de Planificación*, supra; *Com. de la Mujer v. Srio. de Justicia*, supra; *Suárez Sánchez v. Tribunal Superior*, 92 D.P.R. 507 (1965); *Asoc. Guardias Penales v. Srio. de Justicia*, 87 D.P.R. 711 (1963).

([17]) *Noriega v. Hernández Colón*, supra; *C.E.E. v. Depto. de Estado*, 134 D.P.R. 927 (1993); *Berberena v. Echegoyen*, 128 D.P.R. 864 (1991); *Asoc. de Periodistas v. González*, 127 D.P.R. 704 (1991); *Nogueras v. Hernández Colón*, 127 D.P.R. 638 (1991); *Noriega v. Gobernador*, 122 D.P.R. 650 (1988); *El Vocero v. Junta de Planificación*, supra; *Com. de la Mujer v. Srio. de Justicia*, supra; *Fund. Arqueológica v. Depto. de la Vivienda*, supra; *E.L.A. v. Aguayo*, supra.

([18]) *Noriega v. Hernández Colón*, supra; *Silva v. Hernández Agosto, supra; Santa Aponte v. Srio. del Senado*, supra; *Estevez v. Srio. Cám. de Representantes*, 110 D.P.R. 585 (1981); *P.S.P. v. E.L.A.*, 107 D.P.R. 590 (1978); *P.P.D. v. Ferré, Gobernador*, 98 D.P.R. 338 (1970).

([19]) Los hechos de este caso, no hay duda, presentan un caso controversia real y concreto, no hipotético o abstracto. Por otra parte, a pesar de las elecciones de 1992, el recurso no es académico porque: (1) el demandante apelante Noriega Rodríguez fue reelecto y continúa siendo el portavoz del P.I.P. en la Cámara de Representantes; (2) las partes demandadas han sido sustituidas a tenor con lo dispuesto en la Regla 22.4 de las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. III; (3) la Regla XXXIII del Reglamento de la Cámara de Representantes, *supra*, continúa vigente, y (4) la situación es capaz de repetirse (y se ha repetido) con el demandante apelante y con otros

█ Específicamente, la doctrina de cuestión política impide la revisión judicial de asuntos cuya resolución corresponda a las otras ramas políticas de gobierno o al electorado.[20] Un tribunal se enfrenta a una cuestión política, no susceptible de adjudicación judicial, cuando existe uno de los elementos siguientes: (1) una delegación expresa del asunto en controversia a otra rama de gobierno; (2) ausencia de criterios o normas judiciales apropiadas para resolver la controversia; (3) imposibilidad de decidir sin hacer una determinación inicial de la política pública que no le corresponde a los tribunales; (4) imposibilidad de tomar una decisión sin expresar una falta de respeto hacia otra rama de gobierno; (5) una necesidad poco usual de adherirse sin cuestionar a una decisión política tomada previamente, y (6) potencial de confusión proveniente de pronunciamientos múltiples de varios departamentos de gobierno sobre un asunto.[21]

Si la Constitución confiere una facultad expresa a una rama de gobierno y ésta es de naturaleza política, la misma no estará sujeta a revisión judicial salvo que se ejecute incorrectamente, afectando derechos constitucionales de igual jerarquía. Véanse: *Powell v. McCormack*, 395 U.S. 486 (1969); *United States v. Nixon*, 418 U.S. 683 (1974); *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986); R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. I, págs. 697–698.

El Profesor Tribe sugiere que en los casos que envuelven la doctrina de cuestión política lo importante es el análisis

---

legisladores.

[20] El primer caso sobre la doctrina de cuestión política en la jurisdicción federal fue *Luther v. Borden et al.*, 48 U.S. 1 (1849). En ese caso, el Tribunal Supremo determinó que si las acciones del Congreso o del Presidente estaban dentro de su autoridad constitucional y no violaban los límites de dicha autoridad, éstas no podían ser cuestionadas en un tribunal. Véanse: *Baker v. Carr*, 369 U.S. 186 (1962); *Powell v. McCormack*, 395 U.S. 486 (1969); Serrano Geyls, *op. cit.*, págs. 679–707 esc. 12.

[21] *Baker v. Carr*, supra, según citado en *Silva v. Hernández Agosto*, supra.

sobre si una cláusula constitucional provee derechos que pueden ser compelidos mediante acción judicial. L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, págs. 98 y 106.

Por su parte, el Profesor Scharpf considera que la doctrina de cuestión política debe ser explicada en términos funcionales, atados a los hechos específicos de los casos. La doctrina no es aplicable cuando existen derechos individuales importantes que podrían ser afectados si el Poder Judicial no actúa. F.W. Scharpf, *Judicial Review and the Political Question: A Functional Analysis*, 75 Yale L.J. 517, 566–597 (1966).([22])

Según el Profesor Serrano Geyls existen tres (3) vertientes en la doctrina de cuestión política: (1) existe un asunto asignado textualmente por la Constitución a otra rama del Gobierno; (2) no existen criterios de decisión susceptibles de descubrirse y administrarse por los tribunales, y (3) la prudencia exige la abstención judicial. Serrano Geyls, *op. cit.*, págs. 679–680.

### III

En casos relativos a la impugnación de reglas del Congreso norteamericano, el Tribunal Supremo federal no se ha mostrado particularmente dispuesto a entender en disputas sobre la justicia, la interpretación o la aplicación de éstas.([23]) Dentro de este contexto, el Tribunal Supremo federal examinó por primera vez el alcance de la revisión judicial en *United States v. Ballin*, 144 U.S. 1 (1891). La regla en controversia era la Regla XV del Reglamento de la

---

([22]) Para una discusión sobre posibles métodos de análisis para la aplicación de la doctrina de cuestión política, véanse: 1 *Treatise on Constitutional Law: Substance and Procedure* Sec. 2.16, págs. 275–297 (2da ed. 1992); D.O. Bernstine, *The Political Question Doctrine: A Perspective on its Procedural Ramifications*, 31 U. Kan. L. Rev. 115 (1982); L. Henkin, *Is there a "Political Question" Doctrine?*, 85 Yale L.J. 597 (1976).

([23]) S. Bach, *The Nature of Congressional Rules*, 5 J.L. & Pol. 725, 730–731 (1989).

Cámara de Representantes, *supra*, pág. 34, que establecía que miembros presentes en una sesión aunque no votaran serían contados para efectos del quórum requerido.[24] Antes de que se adoptara dicha regla, el requisito de quórum solo podía ser satisfecho si la mayoría de los miembros votaban por la medida propuesta. Los importadores Ballin, Joseph & Co. alegaron que una ley sobre impuestos no tenía validez porque había sido aprobada por menos de la mayoría que votaba y que no se cumplía con el quórum constitucional.

El Tribunal se negó a revocar la regla congresional expresando que "[n]either do the advantages or disadvantages, the wisdom or folly, of such a rule present any matters of judicial consideration. With the courts the question is only one of power. The Constitution empowers each house to determine its rules of proceedings". *United States v. Ballin*, supra, pág. 5. A pesar de esta contundente aseveración, el Tribunal Supremo se reservó la autoridad final para determinar si una regla congresional violentaba algún derecho fundamental garantizado por la Constitución. En definitiva, reconoció el poder del Congreso para crear sus propias reglas, reservándose la facultad de revisarlas si violaban algún derecho constitucional.[25] Éste es el criterio provisto por el Tribunal para determinar si las reglas legislativas serían o no revisadas. M.B. Miller, *The Justiciability of Legislative Rules and the "Political" Political Question Doctrine*, 78 Cal. L. Rev. 1341, 1349 (1990).

Ya en pleno siglo XX, el Tribunal Supremo federal exa-

---

[24] La regla en cuestión disponía:

" '3. On the demand of any member, or at the suggestion of the Speaker, the names of members sufficient to make a quorum in the hall of the House who do not vote shall be noted by the clerk and recorded in the Journal and reported to the Speaker with the names of the members voting, and be counted and announced in determining the presence of a quorum to do business.' (Ho.Journal, 230, Feb. 14, 1890.)" citada en *United States v. Ballin*, 144 U.S. 1, 5 (1891).

[25] "It may not by its rules ignore constitutional restraints or violate fundamental rights, and there should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained." *United States v. Ballin*, supra, pág. 5.

minó una regla del Senado relativa a la votación sobre una nominación de la Rama Ejecutiva. En *United States v. Smith*, 286 U.S. 6 (1932), la Rama Ejecutiva cuestionó la validez de la Regla XXXVIII del Reglamento de la Cámara de Representantes[26] luego de que el Senado solicitara que el Presidente Hoover devolviera una resolución que confirmaba un nombramiento para que el Cuerpo reconsiderara el mismo. El Presidente se negó a cumplir con lo solicitado y el Senado reconsideró y rechazó el nombramiento.

En este caso el Tribunal revisó la regla y aclaró que la controversia era sobre la interpretación de la aplicabilidad de la misma y no sobre su constitucionalidad. *United States v. Smith*, supra, pág. 33. A pesar de reconocer que al ejercer su poder de revisión, el Tribunal debía dar peso a la interpretación que hacía el Senado sobre sus propias reglas, éste mantuvo que el historial y los precedentes del Cuerpo no demostraban que el Senado tuviera la facultad para reconsiderar un voto de confirmación después de que un nominado había tomado posesión de su cargo y comenzado a ejercer sus deberes. Íd., págs. 33 y 37–48. El Tribunal señaló que cuando la interpretación de una regla afectaba a personas que no eran miembros del Senado, la cuestión planteada era necesariamente una justiciable. Íd., pág. 33.

En *Christoffel v. United States*, 338 U.S. 84 (1949), el

---

[26] La Regla XXXVIII, en sus incisos 3 y 4, disponía:

" '3. When a nomination is confirmed or rejected, any Senator voting in the majority may move for a reconsideration on the same day on which the vote was taken, or on either of the next two days of actual executive session of the Senate; but if a notification of the confirmation or rejection of a nomination shall have been sent to the President before the expiration of the time within which a motion to reconsider may be made, the motion to reconsider shall be accompanied by a motion to request the President to return such notification to the Senate. Any motion to reconsider the vote on a nomination may be laid on the table without prejudice to the nomination, and shall be a final disposition of such motion.

"4. Nominations confirmed or rejected by the Senate shall not be returned by the Secretary to the President until the expiration of the time limited for making a motion to reconsider the same, or while a motion to reconsider is pending, unless otherwise ordered by the Senate.' " Citada en *United States v. Smith*, supra, págs. 30–31 (1932).

Tribunal Supremo pasó juicio nuevamente sobre la regla de un comité de la Cámara de Representantes. En este caso el peticionario fue convicto de perjurio por su testimonio ante el Comité de Educación y Trabajo. La evidencia presentada demostraba que al momento en que el peticionario cometió el alegado perjurio no había quórum constituido. El Tribunal determinó que bajo las reglas y prácticas de la Cámara de Representantes un comité del Cuerpo solo podía requerir testimonio cuando el quórum estaba debidamente constituido no sólo al comienzo de la sesión, sino durante el momento en que el testigo era interrogado. En ausencia del quórum requerido, el comité no era un "tribunal competente" tal y como exigía el estatuto que penalizaba el perjurio en el Distrito de Columbia. Íd., pág. 90. El Tribunal interpretó una regla del Congreso porque estaba en juego un derecho fundamental de un acusado.([27]) Íd.

En *Yellin v. United States,* 374 U.S. 109 (1963), el Tribunal Supremo entendió en otra controversia relativa a la aplicación de una regla de un comité congresional.([28]) El

---

([27]) El Tribunal explicó:

"Congressional practice in the transaction of ordinary legislative business is of course none of our concern, ... The question is neither what rules Congress may establish for its own governance nor whether presumptions of continuity may protect the validity of its legislative conduct. ... The heart of this case is that by the charge that was given it the jury was allowed to assume that the conditions of competency were satisfied even though the basis in fact was not established ...

"...This not only seems to us contrary to the rules and practice of the Congress, but denies petitioner a fundamental right." *Christoffel v. United States,* 338 U.S. 84, 88–90 (1949).

([28]) La regla disponía:

" 'IV—Executive and Public Hearings:

"A—Executive:

" '(1) If a majority of the Committee or Subcommittee, duly appointed as provided by the rules of the House of Representatives, believes that the interrogation of a witness in a public hearing might endanger national security or unjustly injure his reputation, or the reputation of other individuals, the Committee shall interrogate such witness in an Executive Session for the purpose of determining the necessity or advisability of conducting such interrogation thereafter in a public hearing.

"B—Public Hearings:

(1) All other hearings shall be public.' " (Énfasis suprimido.) Citada en *Yellin v. United States,* 374 U.S. 109, 114-115 (1963).

peticionario Yellin rehusó contestar preguntas ante un subcomité de la Cámara de Representantes, razón por la cual fue convicto por desacato. En *Yellin v. United States*, supra, el Tribunal Supremo determinó que las reglas del Congreso y sus comités son enjuiciables, pero que se debe dar considerable peso a la práctica e interpretación que haga el Congreso sobre dichas reglas. Por esta razón, el Tribunal decidió que el subcomité no obedeció su propia regla sobre el interrogatorio de un testigo en sesión ejecutiva, violándosele al testigo el derecho a ser interrogado en privado.[29] Íd. pág. 123.

Por su parte, los tribunales federales de inferior jerarquía también han tenido la oportunidad de decidir sobre la justiciabilidad de las reglas legislativas.[30] Por ejemplo, el Tribunal de Circuito para el Distrito de Columbia ha reconocido que la Rama Judicial no puede revisar las reglas procesales de la Rama Legislativa sin enfrentar problemas sobre la separación de poderes. Al igual que el Tribunal Supremo, el Circuito ha rechazado la idea de que no tiene la facultad para tal revisión, pero se ha autoimpuesto limitaciones discrecionales para proceder con la misma.[31] El

---

[29] Recientemente, en *Nixon v. United States*, 506 U.S. 224 (1993), el Tribunal Supremo federal reafirmó la doctrina de cuestión política como uno de los principios de autolimitación judicial. El Tribunal Supremo, citando a *Baker v.. Carr*, supra, recordó que una controversia no es justiciable por involucrar una cuestión política cuando "there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it". En tal caso, señaló el Tribunal, se debe interpretar el texto constitucional en controversia para determinar si en efecto, y en qué medida, la Constitución ha delegado textualmente la función controvertida. *Nixon v. United States*, supra, pág. 8. El Tribunal razonó, además, que la falta de una acción definitiva y la dificultad de crear un remedio adecuado aconsejaban la autolimitación. Íd., pág. 13. Por último, señaló que las cortes poseen el poder para revisar actuaciones, tanto de la Rama Legislativa como Ejecutiva, cuando las mismas violentan los límites de las cláusulas de la Constitución. Íd., pág. 14.

[30] Véanse: G. Van Tatenhove, *A Question of Power: Judicial Review of Congressional Rules of Procedure*, 76 Ky. L.J. 597, 614–615 (1987–1982); M.B. Miller, *The Justiciability of Legislative Rules and the "Political" Question Doctrine*, 78 Calif. L. Rev. 1341 (1990).

[31] Por ejemplo: *Vander Jagt v. O'Neill*, 699 F.2d 1166 (Cir. D.C.1983), *cert.* denegado, 464 U.S. 823 (1983) ("This circuit has previously expressed its reluctance to review congressional operating rules, though it has never denied its power to do

Tribunal de Circuito para el Distrito de Columbia muchas veces ha enfocado en sus decisiones el estatus del demandante, asumiendo jurisdicción dependiendo de si éste es o no legislador,[32] ya que considera que un legislador puede obtener un remedio de sus compañeros mediante la aprobación, derogación o enmienda de una ley o de un reglamento.[33]

## IV

■ Aunque en nuestra jurisdicción la doctrina de cuestión política no tiene el mismo arraigo que en Estados Unidos, *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977); *Silva v. Hernández Agosto*, supra, ésta sigue siendo una de las reglas de autolimitación en el ámbito local.[34] Al examinar pasadas confrontaciones entre las ramas de

---

so"); *Nixon v. United States*, 938 F.2d 239 (Cir. D.C. 1991), *conf.*, 506 U.S. 224 (1993); *Gregg v. Barrett*, 771 F.2d 539 (Cir. D.C. 1985). *Metzenbaum v. Federal Energy Regulatory Com'n*, 675 F.2d 1282, 1287 (Cir. D.C. 1982) ("To decide [in favor of intervention] would subject congressional enactments to the threat of judicial invalidation on each occasion of dispute over the content or effect or a House or Senate rule."); *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1379 (Cir. D.C. 1981) ("[S]o-called political questions are denied judicial scrutiny, not only because they invite courts to intrude the province of coordinate branches of government, but also because courts are fundamentally under-equipped to formulate national policies or develop standards of conduct for matters not legal in nature."), *cert.* denegado, 455 U.S. 999 (1982); *Exxon Corp. v. F.T.C.*, 589 F.2d 582, 590 (Cir. D.C. 1978) ("Although the courts will intervene to protect constitutional rights from infringement by Congress, including its committees and members... where constitutional rights are not violated, there is no warrant for the judiciary to interfere with the internal procedures of Congress." (citas omitidas), *cert.* denegado, 441 U.S. 943 (1979); *Harrington v. Bush*, 553 F.2d 190, 214 (Cir. D.C. 1977) ("In deference to the fundamental constitutional principle of separation of powers, the judiciary must take special care to avoid intruding into a constitutionally delineated prerogative of the Legislative Branch."); *Consumers U. v. Periodical Corr. Ass'n*, 515 F.2d 1341, 1351 (Cir. D.C. 1975) ("[This case is] not justiciable by reason of the textually demostrable commitment of such rules to the legislative branch of government."), *cert.* denegado, 423 U.S. 1051 (1976).

[32] Véase Van Tantenhove, *supra*, esc. 29, págs. 597 y 619–622.

[33] Por ejemplo, *Vander Jagt v. O'Neill*, supra; *Gregg v. Barrett*, supra; *Consumers Union of U.S., Inc. v. Periodical Corresp. Ass.'n*, 365 F. Supp. 18 (D.C. 1973).

[34] El Tribunal Supremo de Estados Unidos ha declinado descartar la doctrina de cuestión política. *Nixon v. United States*, supra. Véanse: *Gilligan v. Morgan*, 413 U.S. 1 (1973); *Roudebush v. Hartke*, 405 U.S. 15, 19 (1972); *Powell v. McCormack*, supra.

nuestro Gobierno,[35] hemos expresado que si la Constitución confiere una facultad expresa a una rama de gobierno y ésta es de naturaleza política, la misma no estará sujeta a revisión judicial salvo que dicha facultad sea ejecutada incorrectamente, afectando derechos constitucionales de igual jerarquía. Cuando así suceda, nuestro ordenamiento jurídico no puede evadir la responsabilidad constitucional de interpretar el derecho en casos de conflicto entre las ramas gubernamentales, ya que éstas no pueden convertirse en árbitros de sus propios actos. *P.S.P. v. E.L.A.*, 107 D.P.R. 590, 596 (1978); *Silva v. Hernández Agosto*, supra, pág. 55; *Peña Clos v. Cartagena Ortiz*, 114 D.P.R. 576, 591 (1983).

▮ Ahora bien, cuando ejercemos la función ineludible e indelegable de interpretar el Derecho en casos de conflictos sobre derechos políticos, así como la constitucionalidad de las fuentes de esos derechos, debemos actuar con mesura, respetando el criterio de otros cuerpos gubernamentales sobre la extensión de sus propios poderes. *P.S.P. v. E.L.A.*, supra, pág. 599; *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250, 277–278 (1978).

Al examinar la validez constitucional de una actuación legislativa impugnada por un legislador hemos expresado que los tribunales son los encargados de "definir [los] contornos [de las facultades del Poder Legislativo y Ejecutivo] y la determinación de la validez de su[s] ejercicio[s] son asuntos cuidadosamente reservados a los tribunales". *Santa Aponte v. Srio. del Senado*, supra, pág. 759. En esa ocasión señalamos que el Poder Judicial es el intérprete final de la Constitución. Haciéndonos eco de las palabras de Alexander Hamilton en *El Federalista*, expresamos que los cuerpos legislativos no pueden ser los jueces constitucionales de sus propios poderes.

---

[35] Véanse, por ejemplo: *Nogueras v. Hernández Colón*, supra; *Silva v. Hernández Agosto*, supra; *Hernández Agosto v. Romero Barceló*, supra; *Peña Clos v. Cartagena Ortiz*, 114 D.P.R. 576 (1983); *Santa Aponte v. Srio. del Senado*, supra.

Pocos años después, en *Corujo Collazo v. Viera Martínez*, 111 D.P.R. 552 (1981), reafirmamos los principios establecidos en *Santa Aponte v. Srio. del Senado,* supra, en el sentido de que a pesar de que la Constitución del Estado Libre Asociado de Puerto Rico reconoce que la Cámara de Representantes es el único juez de la elección de sus miembros, un representante tiene derecho a ocupar un escaño hasta tanto se investigue todo lo relacionado con su juramentación y toma de posesión.

En *Silva v. Hernández Agosto*, supra, revisamos la validez constitucional de la Regla 7.1 del Reglamento para Regir la Investigación sobre los Sucesos del Cerro Maravilla de 24 de octubre de 1985, a petición de los Senadores Rolando A. Silva, Calixto Calero Juarbe y Mercedes Torres Vda. de Pérez, en calidad de miembros de la Comisión de lo Jurídico del Senado y en representación de la minoría por el Partido Nuevo Progresista. Nuevamente manifestamos que la interpretación inicial que de la Constitución haga otra rama de gobierno merece deferencia, sin embargo, debe prevalecer la norma de que la determinación final corresponde a los tribunales.

■ Reconocimos que la práctica de que los cuerpos legislativos adopten sus reglas de gobierno interno como corolario del poder inherente para controlar sus procedimientos es de arraigo histórico en nuestra jurisdicción. Acta Foraker, 31 Stat. 77, Documentos Históricos, Sec. 3, L.P.R.A., Tomo 1; Acta Jones, 39 Stat. 960, Documentos Históricos, Art. 32, L.P.R.A., Tomo 1; Art. III, Sec. 9, Const. E.L.A., L.P.R.A., Tomo 1. Aclaramos, no obstante, que al ejercer su función de reglamentar, la Asamblea Legislativa y sus comisiones no pueden obviar e ignorar las limitaciones constitucionales. Nuevamente, enfatizamos la necesidad de que los tribunales actúen con prudencia y deferencia para aclarar los contornos de la Constitución y facilitar la resolución de las diferencias surgidas ante interrogantes sobre el alcance de los poderes constitucionales de cuales-

quiera de las ramas del Gobierno. *Silva v. Hernández Agosto*, supra, pág. 57.

Resumiendo, sobre la doctrina de cuestión política, y para contestar las interrogantes que previamente presentamos sobre si el Art. III de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, nos prohíbe revisar la Regla XXXIII del Reglamento de la Cámara de Representantes, aquí concluimos que: (1) aunque la doctrina de cuestión política, tanto en la jurisdicción federal como en la nuestra, ha generado cierta confusión y polémica,[36] ni en el Tribunal Supremo federal ni en este Foro se ha descartado; (2) cuando exista una delegación expresa del asunto en controversia a otra rama de gobierno, ésta estará sujeta a revisión judicial sólo si se afectan derechos constitucionales individuales; (3) a tono con la prudencia y mesura que debe existir al revisar un asunto asignado por la Constitución a otra rama de gobierno, la revisión judicial será admisible sólo si existen criterios judiciales apropiados para resolver la controversia; (4) al adoptar sus reglas de gobierno y procedimiento interno, la Asamblea Legislativa no puede ignorar las limitaciones y disposiciones constitucionales, y (5) en el caso de que los derechos constitucionales afectados sean los de los propios legisladores, como regla general, las Reglas Legislativas sólo serán revisables si éstos no pueden obtener un remedio de sus compañeros legisladores mediante la aprobación, derogación o enmienda de una ley o reglamento.

## V

◼ Sabido es que nuestra Constitución, en su Art. III, *supra*, que tiene como fin la formación de un Gobierno de-

---

[36] Al respecto, véanse: Tribe, *op. cit.*, págs. 96–107 esc. 11; Henkin, *supra*, esc. 22. También veánse las opiniones mayoritarias y disidentes en *Rexach Benítez v. Gobernador*, 119 D.P.R. 521 (1987); *Silva v. Hernández Agosto*, supra; *Santa Aponte v. Srio. del Senado*, supra; *P.P.D. v. Ferré, Gobernador*, supra.

mocrático y representativo, delega el Poder Legislativo en una Asamblea bicameral. Ambos Cuerpos, Senado y Cámara de Representantes, como foros parlamentarios tienen la función de formular leyes, investigar y fiscalizar al Gobierno, debatir asuntos de interés y mantener al Pueblo informado sobre la marcha de los asuntos públicos. *Romero Barceló v. Hernández Agosto*, 115 D.P.R. 368, 379 (1984).

▮ Para facilitar la tarea legislativa y conforme a una práctica que data de siglos,[37] los miembros de la Asamblea Constituyente incorporaron de manera expresa la facultad de las Cámaras Legislativas de Puerto Rico para adoptar reglas propias de los cuerpos legislativos para sus procedimientos y gobierno interno. Art. III, Sec. 9, Const. E.L.A., *supra; Silva v. Hernández Agosto*, supra, págs. 55–56.

Nuestra Constitución no contiene disposiciones detalladas sobre el procedimiento legislativo. El Art. III, Sec. 17, *supra*, sólo ofrece unas directrices generales. Es en los reglamentos de las Cámaras en los que se detalla el trámite

---

[37] En el ámbito local, el Acta Foraker, 31 Stat. 77, Documentos Históricos, Sec. 3, L.P.R.A., Tomo 1, y el Acta Jones, 39 Stat. 960, Documentos Históricos, Sec. 32, L.P.R.A., Tomo 1, invistieron a las instituciones legislativas creadas por ellas con la autoridad para regir sus procedimientos internos. *Silva v. Hernández Agosto*, supra; *De Diego et al. v. La Cámara, etc.*, 5 D.P.R. 114 (1904).

En el ámbito federal, la Constitución de Estados Unidos en su Art. I, Sec. 5, cl. 2, L.P.R.A., Tomo 1, provee para que cada Cámara del Congreso determine las reglas de sus procedimientos. Según James Madison la Convención Constituyente adoptó esa cláusula sin discusión. J.E. Castello, *The Limits of Popular Sovereignty*, 74 Cal. L.R. 491, 530 (1986). Además, en todas las constituciones de los estados de la nación, excepto en las de Carolina del Norte y Georgia, se establece que la Legislatura creará las reglas de sus procedimientos.

Respecto a la tradición parlamentaria británica, W. Balckstone y otros historiadores sugieren que la autonomía procesal de la Cámara de los Comunes data de antes del Siglo 18. Castello, *supra*.

Además, en veinticuatro (24) países (incluyendo Austria, Japón, Senegal y la antigua Unión Soviética) las reglas básicas del Parlamento se establecen en la Constitución y otras leyes, mientras que *las reglas de procedimientos* son adoptadas por los propios parlamentos. En los demás países las legislaturas establecen sus propias reglas de procedimiento. *Parliaments of the World*, 2da ed., Gran Bretaña, Ed. Inter-Parliamentary Union, 1986, Vol. 1, págs. 3–4.

legislativo;([38]) siendo éstos sus instrumentos y sus herramientas fundamentales de trabajo. De hecho, es necesario que todo cuerpo deliberativo sea gobernado por reglas de procedimiento de manera que la voluntad de la mayoría sea determinada en una forma ordenada.([39])

Ahora bien, los reglamentos de las Cámaras Legislativas son de vigencia limitada. Son ley para la Asamblea Legislativa que los aprueba. Al iniciarse una asamblea se aprueba un nuevo reglamento o se ratifica el que estuvo en vigor anteriormente.([40]) Las fuentes de las reglas del proceso legislativo son las disposiciones constitucionales o estatutarias, las reglas adoptadas por la propia Asamblea Legislativa, las decisiones judiciales, las fuentes de derecho parlamentario, las costumbres, el uso, las órdenes o las resoluciones de la Asamblea. Cada cuerpo legislativo está en posición óptima para adoptar reglas de procedimiento, así como para aplicar o interpretar las mismas.([41]) Mas no pueden dichas reglas desconocer las disposiciones constitucionales. La Legislatura tiene absoluta discreción para decidir en qué forma lleva sus procedimientos y cumple con los requisitos constitucionales.([42])

Como regla general, los tribunales no pasarán juicio sobre las interpretaciones o la aplicación de las prácticas parlamentarias de un cuerpo legislativo con la autoridad necesaria para crear sus reglas de gobierno interno, siempre que dichas reglas estén dentro del ámbito de sus

---

([38]) Al respecto, véase C. Ramos de Santiago, *El Gobierno de Puerto Rico*, 2da ed., Río Piedras, Ed. Universitaria, 1970, pág. 591.

([39]) N. Rigual, *El poder legislativo de Puerto Rico*, Río Piedras, Ed. U.P.R., 1961, pág. 72; P. Mason, *Manual of Legislative Procedures for Legislative and other Governmental Bodies*, California, California Legislature, 1962, pág. 29.

([40]) Véanse: Regla XLII del Reglamento de la Cámara de Representantes de Puerto Rico, *supra*; las Reglas 5.4 y 48.1 del Reglamento del Senado de Puerto Rico, 1977. Véase, además, Mason, *op. cit.*, pág. 42 esc. 38.

([41]) Van Tantenhove, *supra*, págs. 628–629 esc. 29.

([42]) Sobre la naturaleza de las reglas legislativas, específicamente las del Congreso estadounidense, véanse: Bach, *supra*, esc. 23; Mason, *op. cit.*, págs. 31–42 esc. 38.

poderes. Si la regla adoptada por la Legislatura no es contraria a las disposiciones constitucionales o no violenta derechos fundamentales individuales o existe una relación razonable entre el método y el resultado que se persigue, no le corresponde a un tribunal decidir si otra regla es más apropiada o justa. La interpretación que hace un cuerpo de sus reglas de procedimiento debe ser aceptada por un tribunal a menos que la misma sea claramente errónea. P. Mason, *Manual of Legislative Procedures for Legislative and other Governmental Bodies*, California, California Legislature, 1962, pág. 72. Cabe señalar que, por su propia naturaleza, las Reglas Legislativas, al establecer el sistema de acción para tomar decisiones de política pública, son fuente de posibles conflictos entre los miembros de la Asamblea.

 Sobre la interpretación del Reglamento de la Cámara de Representantes, la Regla XLII(2), *supra*, establece que cuando se susciten cuestiones *no previstas* por dicho reglamento, se aplicarán las disposiciones del Manual de Práctica Parlamentaria de Jefferson,[43] con la interpretación de la regla correspondiente que se le haya dado por la Cámara de Representantes de Estados Unidos.

 A su vez, el Manual de Jefferson, *op. cit.*, así como los Reglamentos de los cuerpos legislativos de Puerto Rico y del Congreso de Estados Unidos están inspirados en las reglas de derecho parlamentario.[44] Los principios funda-

---

[43] El Manual de Práctica Parlamentaria de Jefferson en *Instrumentos Parlamentarios*, Puerto Rico, Cámara de Representantes, 1976, fue escrito por Thomas Jefferson cuando ocupaba la Presidencia del Senado en su carácter de Vicepresidente de la Nación entre 1797 y 1801, utilizando como fuente el derecho parlamentario inglés. El Reglamento de la Cámara de Representantes del Congreso de Estados Unidos también dispone que los principios del manual gobernarán a la Cámara en todos los casos que sean aplicables y que resulten compatibles con las reglas y órdenes permanentes de la Cámara de Representantes.

[44] El primer sistema ordenado de reglas de procedimiento puede acreditarse al Rey Edgardo de Inglaterra que en 959 instituyó un sistema para resolver las diferencias y hacer decisiones en una manera ordenada y democrática. Los colonos americanos llevaron el procedimiento parlamentario a las legislaturas de las colonias. H.E. Hellman, *Parliamentary Procedure*, Nueva York, Ed. MacMillan, 1966, págs.

mentales de la práctica parlamentaria son: (1) facilitar los trabajos de las asambleas y promover la cooperación y la armonía entre los que participan en las mismas; (2) procurar la igualdad de derechos, privilegios y obligaciones de los miembros; (3) determinar con claridad la voluntad de la mayoría; (4) proteger los derechos de la minoría; (5) fomentar la discusión libre y completa de toda proposición presentada a la asamblea; (6) explicar el significado y efecto de las cuestiones presentadas para votación, y (7) preservar la justicia y la buena fe en las asambleas. A.F. Sturgis, *Standard Code of Parliamentary Procedure*, 2da ed., Nueva York, McGraw-Hill, 1966, págs. 7–11. Muchas de las reglas de procedimientos parlamentarios no sólo protegen a las minorías de las prácticas injustas de la mayoría, sino que persiguen evitar, además, las actuaciones o tácticas de obstrucción de las minorías. También son necesarias para evitar confusiones, escogiendo un curso de acción cuando varios pueden ser seguidos. Mason, *op. cit.*, pág. 30. Por otra parte, la aplicación del derecho parlamentario varía en los distintos cuerpos legislativos, ya que se toma en consideración las necesidades específicas de estos organismos. Íd., págs. 59–60.

▮ Respecto a la Regla XXXIII de la Cámara de Representantes, *supra*, sobre votaciones, ésta, al igual que otros procedimientos del Cuerpo, tiene su origen en las reglas de procedimiento parlamentario. En dichos procedimientos la votación no es obligatoria, a menos que exista una regla especial en contrario. R.B. Bothwell, *Manual de Procedimientos Parlamentarios*, 2da ed. rev., Río Piedras, Ed. U.P.R., 1962, pág. 62. Además se recomienda la abstención "cuando el asunto ante la asamblea se refiera o le afecte [al asambleísta] exclusivamente". Íd., pág. 66. El derecho parlamentario prohíbe la votación cuando se trata de autori-

---

5–7. Tras siete (7) siglos de continuo desarrollo, el procedimiento parlamentario se ha difundido hasta el punto de lograr aceptación universal. Bothwell, *op. cit.*, pág. 1 esc. 6.

zar una transacción financiera con un miembro del Cuerpo o cuando se formulan o se ventilan cargos contra éste. Íd., pág. 66.

■ Los comentaristas sobre derecho parlamentario han señalado que aunque un miembro de un cuerpo gubernamental pueda abstenerse de votar, éstos tienen una fuerte obligación de hacerlo en todas las mociones porque el proceso de tomar decisiones es uno de los deberes [primarios] del cargo para el que fueron electos o nombrados. Un oficial público debe abstenerse de votar únicamente si existe un conflicto de interés y no puede votar si existe un interés directo personal o económico. Sturgis, *op. cit.*, pág. 241. Según H.M. Robert, *Reglas de Orden (Revisadas) de Robert*, 1ra ed. español, México, Ed. UTEHA, 1964, pág. 140, "nadie puede votar sobre una cuestión en la que tenga un interés directo, personal o pecuniario"; "es deber de todo miembro, que opina sobre una cuestión, expresarlo mediante su voto", mas no puede obligársele a hacerlo. Íd., pág. 141.[45]

■ En fin, como regla general los cuerpos legislativos hacen mandatoria la asistencia de sus miembros y les requieren votar sobre los asuntos en discusión. Bajo su poder para crear reglas de gobierno y procedimientos internos, dichos cuerpos tienen la facultad para excusar a sus miembros de la votación. La práctica de las legislaturas estatales es excusar a sus miembros de votar cuando éstos tengan un interés personal en el asunto llevado a votación o por otras razones meritorias. Como regla general no se

---

[45] H.M. Robert, *Reglas de Orden (Revisadas) de Robert*, traducción al español por Carlos Palomar, 1ra ed. en español, México, Ed. UTEHA, 1964. Véanse, además: G. Demeter, *Demeter's Manual of Parliamentary Law and Procedure*, Boston, Ed. Bostonia Press, 1961, pág. 41 ("It is the duty of every member to vote on every question before the house, on the theory that he should be willing to participate in the responsibility of the decision. But no one can be compelled to vote, although in rare instances a fine is assesed."), y L.S. Cushing, *Manual for Deliberative Assemblies*, Filadelfia, Ed. McKay Co., 1925, pág. 198 ("It is a general rule that every member who is in the assembly room at the time when the question is stated has not only the right but it is bound to vote").

cuestiona el que un miembro del cuerpo no vote, pero cuando se requiere cierto número de votos o el voto de cierta proporción del número de miembros electos, un miembro del cuerpo puede insistir en que el otro vote o que explique sus razones para abstenerse y que sea el cuerpo el que decida si es excusado o no. Mason, *op. cit.*, págs. 367–368. Sobre esta regla y su aplicación se dice que "it provides no means, any more than the common parliamentary law, of enforcing its own execution, and, not withstanding the rule, members may vote or not, as they please". L.S. Cushing, *Elements of the Law and Practice of Legislative Assemblies in the United States of America*, Boston, Ed. Little, Brown and Co., 1856, pág. 693.

 Aun así, debido a que se considera que votar es un deber y responsabilidad de todo miembro de un cuerpo deliberativo, cuando uno de ellos insiste en que se refleje la abstención en el récord oficial sólo se aceptará esta solicitud si no existen objeciones a la misma.[46]

Al respecto el Manual de Jefferson indica que "every member must give his vote the one way or the other ... as it is not permitted to anyone to withdraw who is in the house when the question is put".[47] El Reglamento del Senado de Estados Unidos establece en su Regla XII[48] que cada Senador "shall, without debate, declare his assent or dissent to the question, unless excused by the Senate". Cuando un

---

[46] "Sometimes a member will insist that his abstention be officially recorded. He wants the record to show that he did not vote on the motion under consideration. While some people think this is making too much of the privilege of not voting, organizations usually oblige such requests, 'if there are no objections' by asking the secretary to record the names who abstain from voting. If this practice becomes a problem by delaying unnecessarily the taking of votes, the organization should formulate a policy on recording abstentions and incorporate it into the bylaws." R.E. Keesey, *Modern Parliamentary Procedure*, Boston, Ed. Houghton Mifflin Co., 1974, pág. 132.

[47] *Constitution, Jefferson's Manual and Rules of the House of Representatives of the United States*, H.R. Doc. No. 101–256, 101st Cong., 2da Sess., Sec. 505 (1991).

[48] En Canadá existe una regla similar. Véase J.G. Bourinet, *Parliamentary Procedure and Practice in the Dominion of Canada*, Nueva Jersey, Ed. Ruthan Reprints, 1971.

Senador decide abstenerse tiene que explicar sus razones y el Cuerpo decide si es excusado o no de votar. Un Senador puede abstenerse de votar cuando opine que existe un conflicto de interés.([49])

El Reglamento de la Cámara de Representantes del Congreso de Estados Unidos en la Regla VIII dispone que todos los miembros "shall vote on each question put, unless he has a direct personal or pecunary interest in the event of such question".([50])

---

([49]) La Regla XII del Senado de Estados Unidos sobre los procedimientos de votación expone:

"1. When the yeas and nays are ordered, the names of Senators shall be called alphabetically; and each Senator shall, without debate, declare his assent or dissent to the question, unless excused by the Senate; and no Senator shall be permitted to vote after the decision shall have been announced by the Presiding Officer, but may for sufficient reasons, with unanimous consent, change or withdraw his vote. No motion to suspend this rule shall be in order, nor shall the Presiding Officer entertain any request to suspend it by unanimous consent.

"2. When a Senator declines to vote on call of his name, he shall be required to assign his reasons therefor, and having assigned them, the Presiding Officer shall submit the question to the Senate: 'Shall the Senator for the reasons assigned by him, be excused from voting?' which shall be decided without debate; and these proceedings shall be had after the rollcall and before the result is announced; and any further proceedings in reference thereto shall be after such announcement.

"3. A Member, notwithstanding any other provisions of this rule, may decline to vote, in committee or on the floor, on any matter when he believes that his voting on such a matter would be a conflict of interest." L.R. Slack, *Senate Manual*, Washington, U.S. Government Printing Of., 1988, pág. 10.

([50]) *House Rules and Manual*, supra.

Sobre las interpretaciones de esta regla se ha dicho:

"It has been found impracticable to enforce the provision requiring every Member to vote ... and such question even if entertained, may not interrupt a pending roll call vote ... and the weight of authority also favors the idea that there is no authority in the House to deprive a Member of the right to vote. ... In one or two early instances the Speaker has decided that because of personal interest, a Member should not vote. ... but on all other occasions and in the later practice the Speaker has held that the Member himself and not the Chair should determine this question ... and the Speaker has denied his own power to deprive a Member of the constitutional right to vote. ... Members may not vote in the House by proxy. ... Instance where a Member submitted his resignation from a committee on grounds of disqualifying personal interest....

"The House has frequently excused Members from voting in cases of personal interest....

"It is a principle of 'immemorial observance' that a Member should withdraw when a question concerning himself arises ... but it has been held that the disqualifying interest must be such as affects the Member directly ... and not as one of a class. ... In a case where question affected the titles of several Members to their seats, each refrained from voting in his own case, but did vote on the indentical cases of his associates. ... And while a Member should not vote on the direct questions

En la Regla XXXVIII del Reglamento del Senado de Puerto Rico, *supra*, también se especifica que los senadores presentes al momento de llevarse a cabo una votación estarán obligados a participar emitiendo su voto, salvo cuando tengan un interés personal directo en el asunto sometido. Podrán abstenerse de votar con el consentimiento de la mayoría cuando: (1) tengan razones de alta trascendencia moral; (2) no estén preparados para emitir su voto por desconocimiento del asunto sobre el cual se esté votando, o (3) por cualquier razón que el Senador entienda meritorio y así lo solicite al Cuerpo y éste lo autorice. Si el Cuerpo decide en la negativa, el Senador tendrá la obligación de emitir su voto.

Las reglas sobre la abstención de Representantes y Senadores no son de reciente adopción en los cuerpos legislativos del Estado Libre Asociado. Por ejemplo, la Regla XIII(5) del Reglamento de la Cámara de Representantes de 1924, sobre votaciones disponía: "Ningún Representante podrá votar si no hubiese estado presente en el Salón cuando el Presidente sometió a votación el asunto. El Representante que se hallase presente al ser sometido un asunto a votación estará obligado a votar, salvo cuando tuviesen el deber o el derecho de abstenerse, o que la Cámara lo excuse por razones de alta trascendencia moral. Esta solicitud será resuelta por la Cámara sin debate." La misma regla aparece en los Reglamentos de 1947 y 1951. En 1955 la regla sobre abstención en las votaciones de los proyectos de ley era similar a la actual.[51]

---

affecting himself, he has sometimes voted on incidental questions...." *House Rules and Manual*, supra, pág. 343.

[51] Disponía la Regla XXXIII del Reglamento de la Cámara de Representantes, 1955, pág. 53:

"5. Todo Representante estará obligado a emitir su voto en los asuntos sometidos a votación, y si tiene en ello interés personal directo deberá abstenerse de votar; y podrá abstenerse con el consentimiento de la Cámara por razones de alta trascendencia moral o cuanto no esté preparado, por desconocimiento del asunto en discusión para emitir su voto.

"6. La Cámara a solicitud de cualquier representante resolverá sin debate cuando una cuestión debe ser considerada de alta trascendencia moral."

También el Reglamento de la Convención Constituyente incluía una regla similar.([52]) En su informe la Comisión de Reglas y Reglamentos de la Constituyente recomendó que su Regla XIII expresara:

"Todo delegado está obligado a emitir su voto en los asuntos sometidos a votación y cuando llamado para votar anuncie su deseo de abstenerse de hacerlo, se le requerirá por la presidencia que exponga brevemente sus razones para no votar, y una vez lo haya hecho el presidente someterá la cuestión a la Convención en la siguiente forma: 'Oídas las razones expuestas por el Sr. Delegado, ¿se le excusa de votar?' La cuestión será decidida sin debate después de pasarse lista para la votación y antes de anunciarse el resultado de la misma." 1 Diario de Sesiones de la Convención Constituyente 236 (1951).

La Comisión expresó que todo delegado tenía la obligación de votar y que era la Convención Constituyente la que debía decidir si el delegado podía abstenerse o no. La Convención Constituyente al aprobar la regla limitando el derecho a abstenerse descartó los argumentos de aquellos que abogaban por el derecho del legislador a abstenerse sin que tuviera que mediar el consentimiento de la mayoría.([53])

---

Esta regla está incluida en los Reglamentos de la Cámara de Representantes de 1961, 1962, 1967, 1969, 1970, 1973, 1975 y 1982, así como en los Reglamentos del Senado de 1955, 1959, 1962, 1966, 1968, 1969, 1970, 1974, 1977, 1981, 1984, 1985 y 1986. Éstos fueron los únicos reglamentos que encontramos disponibles para examinar.

([52]) La Regla XIII del Reglamento de la Convención Constituyente disponía:

"1. Todo delegado estará obligado a emitir su voto en los asuntos sometidos a votación, y si tiene en ellos interés personal directo deberá abstenerse de votar; y podrá abstenerse con el consentimiento de la Convención, en cuestiones de alta trascendencia moral o cuando no esté preparado, por desconocimiento del asunto en discusión, para emitir su voto.

"2. La Convención, a solicitud de cualquier delegado, resolverá sin debate cuando una cuestión deba ser considerada de alta trascendencia moral." 1 Diario de Sesiones de la Convención Constituyente 102–103 (1951).

([53]) El delegado Rivera Colón argumentó en contra de que cada delegado estuviese obligado a votar; en caso que deseara abstenerse de hacerlo tuviese que explicar sus razones, y que la Convención tuviese la facultad para tomar la decisión final sobre si se permitía o no la abstención. Se desató entonces un debate y los constituyentes consideraron los puntos a favor y en contra de la regla. Diario de Sesiones, *supra,* págs. 237–251. La regla fue finalmente enmendada para añadirle que "[e]n caso de que el delegado no exponga sus razones para abstenerse de votar, o en caso de que se niegue a votar no obstante el acuerdo de la Convención, el voto de dicho delegado se contara como emitido en la afirmativa". Íd., págs. 250–251.

La interrogante relativa a qué efecto tiene, si alguno, la abstención de un representante en la votación sobre un asunto de interés público fue expresamente planteada por el delegado Negrón López y discutida durante el debate que precedió a la aprobación de la Regla sobre la abstención de los delegados en la Convención Constituyente.[54] Examinemos qué efecto, si alguno, pueden tener las abstenciones en la aprobación de medidas en la Cámara de Representantes de Puerto Rico.

■ Por mandato constitucional el quórum de la Cámara de Representantes se constituye con una mayoría del número total de los miembros que la componen. Art. IV, Sec. 12, Const. E.L.A., L.P.R.A., Tomo 1; Regla VII(13) del Reglamento de la Cámara de Representantes, *supra*. También, por mandato constitucional, se requiere una mayoría del número total de los miembros que componen el cuerpo

---

[54] "Sr. NEGRÓN LÓPEZ: La pregunta que quiero hacer al Delegado ... es qué ocurriría si la situación a que se refiere el delegado señor Brunet sobre un delegado que no puede formar criterio porque no tiene bastante información ... ¿qué ocurriría si eso incluye a todos los delegados de la Convención Constituyente? ¿Qué le ocurriría a la Convención Constituyente? ¿Cuál sería el efecto y hasta qué punto estaríamos cumpliendo con nuestro deber?

"Sr. ORTIZ STELLA: No se podrían tomar acuerdos. Señalé la situación, que se repite varias veces en el reglamento, en las cuales se necesita mayoría absoluta, o sea 47 ...

"Sr. ORTIZ STELLA: ... Hay un quórum de 50 personas que están presentes en la Convención. Se necesita mayoría absoluta para tomar ciertos acuerdos, conforme el reglamento. Mayoría absoluta son 47. Si se abstienen cuatro, no se pueden tomar acuerdos. Si eso sucede, entonces la Asamblea no podría tomar acuerdos, y creo yo que no estaría cumpliendo con su deber. Aquí se viene a tomar acuerdos, a votar, a tomar decisiones. Tenemos una responsabilidad grave y seria. *Es muy peligroso eso de dejar la abstención del voto al criterio y arbitrio del delegado. Creo que deben intervenir los dos elementos: el delegado y la Convención, pero no dejarlo a la voluntad soberana y libre del delegado.* No se puede abstener. Eso es muy peligroso, compañeros.

"Sr. BRUNET: ¿No cree el compañero que si ocurriera lo que indicó aquí el delegado Negrón, respecto de que una mayoría de la Convención se abstenga porque no tiene elementos de juicio para votar, no cree el compañero que lo propio, en tal situación, es abrir a debate la cuestión para disipar las dudas a fin de que los delegados tengamos oportunidad de entender claramente la cuestión, y entonces decidirnos a votar.

"Sr. ORTIZ STELLA: No, compañero, no lo crea así, porque cuando viene una votación es porque el asunto ha estado en discusión. (Énfasis suplido.) Diario de Sesiones, *supra*, págs. 241–242.

para aprobar un proyecto de ley. Art. III, Sec. 19, Const. E.L.A., L.P.R.A., Tomo 1; Regla XV(14) del Reglamento de la Cámara de representantes, *supra*. Es decir, que si el número total de miembros de la Cámara es de cincuenta y un (51) representantes, excepto cuando dicha composición es aumentada en virtud de las disposiciones sobre la representación de los partidos de minoría, el quórum del Cuerpo se constituye con veintiséis (26) representantes. Así mismo, se requieren los votos de veintiséis (26) representantes para lograr una mayoría absoluta para la aprobación de un proyecto de ley, resolución conjunta o concurrente. Si se generaliza la práctica de abstenerse en las votaciones se podría afectar el proceso legislativo, obstaculizándose la fluidez en la tramitación de la obra del Gobierno y la marcha de los asuntos públicos. En nuestro ordenamiento "la mayoría parlamentaria tiene el deber ineludible de cumplir con el mandato expresado por el pueblo" y las minorías tienen la "obligación especial de descargar su responsabilidad fiscalizadora sin obstaculizar el funcionamiento legislativo". *Silva v. Hernández Agosto*, supra, pág. 70. De manera que si la Constitución del Estado Libre Asociado requiere que el quórum de la Cámara se constituya con una mayoría del número total de los miembros que la componen y ordena una mayoría absoluta para la aprobación de las leyes, la participación de los representantes en todo debate legislativo cobra mayor relevancia.[55]

## VI

Los miembros de la Asamblea Legislativa, electos por el voto directo de los ciudadanos, son los responsables de ejercer el Poder Legislativo creado por nuestra Constitución.

---

[55] Véase Mason, *op. cit.*, pág. 350 esc. 39.

Art. III, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1. Mediante la representación se le da participación y control al ciudadano sobre los asuntos públicos, a tono con el sistema democrático que es fundamental para la vida de la comunidad puertorriqueña. Tan importante es el sistema de representación para la protección de los derechos democráticos de nuestro Pueblo que la Constitución del Estado Libre Asociado establece un procedimiento para garantizar la representación adicional a los partidos de minoría en la Asamblea Legislativa. Art. III, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1.

Sobre los derechos y las facultades de los legisladores, la Constitución se limita a establecer ciertos requisitos sobre educación, ciudadanía, residencia y edad, Art. III, Secs. 5–6, Const. E.L.A., L.P.R.A., Tomo 1; los términos de los cargos de Senador y Representante, Art. III, Sec. 8, Const. E.L.A., L.P.R.A., Tomo 1; otorga inmunidad parlamentaria a los miembros de la Asamblea Legislativa, Art. III, Sec. 14, Const. E.L.A., L.P.R.A., Tomo 1, y señala la incompatibilidad del puesto del legislador con cualquier otro cargo público, Art. III, Sec. 15, Const. E.L.A., L.P.R.A., Tomo 1. Los legisladores tienen la responsabilidad de poner en vigor las funciones propias del proceso legislativo tales como la formulación de leyes, el debate, la investigación de asuntos de interés público y el mantener informado al pueblo sobre la marcha de la cosa pública. *Romero Barceló v. Hernández Agosto*, supra, pág. 379.

■ Sobre el voto del legislador, la Constitución expresa que "[l]as Cámaras llevarán libros de actas donde harán constar lo relativo al trámite de los proyectos y las votaciones emitidas a favor y en contra de los mismos". Art. III, Sec. 17, Const. E.L.A., *supra*, ed. 1982, pág. 344. Además, señala que los proyectos de ley deberán ser aprobados por una mayoría total de los miembros de cada Cámara y que "[t]oda aprobación final o reconsideración de

un proyecto será en votación por lista". Art. III, Sec. 19, Const. E.L.A., *supra*, ed. 1982, pág. 346.([56])

■ Resumiendo, los legisladores son quienes dan vida al mecanismo de representación democrática creada por la Constitución para que la voluntad de nuestro Pueblo sea la fuente del poder público.([57]) Éstos tienen el peso de las funciones de la Asamblea Legislativa, rama forjadora de las leyes que rigen el destino del Pueblo. Siendo requisito constitucional el que las leyes se aprueben por la mayoría de los miembros del número total de los que componen la

---

([56]) En el Informe de la Comisión de la Rama Legislativa a la Convención Constituyente se explica:

"La exigencia de que los proyectos de ley se aprueben por una 'mayoría de los miembros que componen cada una de las cámaras' es indispensable en un sistema político de carácter representativo. La votación por lista es un *medio* de fijar la responsabilidad individual por la aprobación o rechazo de una medida.

*"Libro de Actas*: El libro de actas de las cámaras tiene doble importancia. Sirve para perpetuar los procedimientos y así llevar éstos al conocimiento general y a la vez constituye la prueba de mayor peso ante los tribunales para determinar si la Asamblea Legislativa ha cumplido con los requisitos constitucionales sobre procedimiento. La disposición que recomendamos exige se haga constar en el libro de actas lo relativo al trámite de los proyectos y las votaciones. Posteriormente el artículo 15 exige se anoten en el acta las razones del Gobernador para vedar un proyecto.

"Se recomienda, además, que se fije constitucionalmente la obligación legislativa de dar publicidad a sus procedimientos, aunque se deja a la legislación ordinaria determinar la forma. Una adecuada publicidad de los procedimientos legislativos, especialmente de los debates, aumentaría notablemente el número de personas interesadas en los problemas de gobierno y contribuiría a una mejor fiscalización pública de las actuaciones de los legisladores. La Asamblea Legislativa, además, no tendría que depender exclusivamente de los periódicos para dar publicidad adecuada a sus actividades." 4 Diario de Sesiones, *supra*, pág. 2585.

([57]) Los legisladores tienen que responder ante sus representados por la gestión realizada en la actividad legislativa. Sin embargo, dicha responsabilidad no es un pasaporte para incoar acciones judiciales como medio para defender los intereses de sus representados. Los miembros de la Asamblea Legislativa tienen legitimación activa para presentar una acción judicial cuando se violentan sus prerrogativas, funciones y derechos constitucionales, mas no pueden demandar en representación de sus votantes o del interés público. *Nogueras v. Hernández Colón*, supra; *Hernández Agosto v. Romero Barceló*, supra, pág. 416; *Santa Aponte v. Srio. del Senado*, supra. Tienen que demostrar que poseen derechos de origen constitucional o estatutario que han sido violados y que han sufrido un daño claro y palpable como resultado de la actuación del demandado. *Hernández et al. v. Hernández Colón et al.*, supra. En el caso de *Noriega v. Gobernador*, supra, resolvimos que existen ocasiones en que un legislador posee legitimación para cuestionar una actuación u omisión de la Rama Ejecutiva, la cual estima inconstitucional. Por ejemplo, cuando se afectan las prerrogativas de un legislador porque el Gobernador no pone en vigor una ley. Viéndose *impedido de adjudicar los fondos que por ley le correspondía distribuir*, éste tendrá legitimación para impugnar dicha actuación.

Asamblea Legislativa, el deber de los representantes y senadores de participar en el proceso legislativo resulta de primordial importancia. La Constitución del Estado Libre Asociado no crea derechos de rango constitucional a favor de la abstención en las votaciones de los proyectos de ley. La abstención en las votaciones legislativas es materia regulada por el derecho parlamentario y las reglas internas de cada asamblea.

## VII

Pasemos, pues, a analizar si los hechos ante nos reflejan si al ejercer su facultad para reglamentar los procedimientos internos de la Cámara de Representantes, dicho cuerpo violentó algún derecho constitucional de los representantes demandantes, o si los representantes pueden obtener remedios en la Rama Legislativa para la situación de autos.

Tras el trasfondo doctrinal e histórico expuesto, debemos concluir que la Regla XXXIII del Reglamento de la Cámara de Representantes, *supra*, está dentro de los parámetros constitucionales de las facultades legislativas para crear normas de procedimiento y gobierno interno del Cuerpo. Aunque nuestra Cámara de Representantes, contrario a como en ocasiones ha hecho la Cámara de Representantes del Congreso estadounidense, ha decidido poner en vigor dicha regla, al así hacerlo no se lesionaron las prerrogativas legislativas de los demandantes ni su derecho a la libre expresión.(58) Éstos participaron del debate anterior a las votaciones sobre las resoluciones en cuestión. A pesar de que no se les concedió autorización para abstenerse y de que su abstención no fue registrada en el Libro de Actas, en el Diario de Sesiones constan sus

---

(58) Cada cuerpo legislativo puede crear, interpretar sus reglas de procedimiento y la Regla XIII del Reglamento de la Cámara de Representantes, *supra*, establece que cuando se susciten cuestiones *no previstas* por dicho reglamento es que se aplicarán las disposiciones del Manual de Práctica Parlamentaria y la interpretación de la Cámara de Representantes de Estados Unidos.

argumentos y señalamientos. Tampoco se les obligó a votar, sino que no se incluyó la abstención en el libro de actas, donde según el mandato constitucional se incluyen los votos a favor o en contra.

Por lo tanto, no nos corresponde decidir si la regla en cuestión es o no una sabia o arcaica; si ésta debe ser o no puesta en vigor por el cuerpo legislativo; o si a tono con el espíritu democrático de nuestro sistema de gobierno debe ser o no enmendada.[59] La sabiduría, la eficiencia o la justicia de las reglas parlamentarias de nuestras Cámaras no son materia para ser juzgada por el Tribunal si no existe una infracción constitucional. Para que un cuerpo legislativo funcione eficientemente se tienen que obedecer las reglas del propio Cuerpo. Debe prevalecer el mandato establecido por el Reglamento de manera que se eviten confusiones y múltiples desacuerdos.

El análisis anterior corresponde a los legisladores. Los reglamentos legislativos son de naturaleza dinámica. El contenido de las reglas puede ser ajustado a las realidades del cuerpo legislativo. A través del debate legislativo, tal y como lo hicieron los delegados de la Convención Constituyente, los demandantes apelantes pueden dirigir sus esfuerzos y argumentos para cambiar una regla que ellos consideren ajena a la realidad puertorriqueña. Incluso, si tomamos en consideración los hechos posteriores a la demanda, los argumentos de los representantes apelantes ya han calado en el espíritu de algunos de sus compañeros legisladores.

Por otra parte, no podemos convertirnos en árbitros de todas las disputas internas que tienen los legisladores so-

---

[59] Los Reglamentos del Senado y del Congreso de Diputados de España contienen disposiciones específicas que permiten a los miembros de dichos cuerpos declarar que se abstienen en un votación. Véase Art. 96(2) del Reglamento del Senado de 26 de mayo de 1982 y Art. 86 del Reglamento del Congreso de los Diputados de 10 de febrero de 1982.

bre la interpretación y aplicación de reglas legislativas relativas a procedimientos puramente parlamentarios. Sin embargo, no estamos abdicando a nuestra facultad de ser los máximos intérpretes de las actuaciones legislativas. Dicha facultad la ejerceremos cuando las actuaciones de otras ramas de gobierno presenten claros problemas de constitucionalidad y no meras disputas procesales o interpretativas. No podemos trasladar al foro judicial las controversias internas de las ramas legislativas, que son producto de las discrepancias entre los legisladores, surgidas a través del proceso normal y usual del debate legislativo.[60]

Por todo lo antes expuesto *se dictará sentencia confirmando la emitida por el foro de instancia.*

El Juez Asociado Señor Fuster Berlingeri no intervino.

---

[60] En vista de lo antes discutido y resuelto no consideramos necesario entrar en los planteamientos sobre inmunidad legislativa y separación de poderes presentados por las partes en el caso de autos.