Opinión disidente emitida por la
Juez Asociada Señora Ro-dríguez Rodríguez.
Hoy una mayoría de este Tribunal abdica al llamado impostergable de interpretar coherente, íntegra y razona-blemente la Constitución del Estado Libre Asociado de Puerto Rico ante embates internos y externos. En su lugar, esa mayoría opta por una metodología interpretativa que dista del ponderado quehacer de un juez de esta Curia y raya en la elaboración de un grimorio judicial para enfren-tarse a problemas de índole constitucional.
Disiento del proceder que este Foro adelanta hoy por entender que esa actuación debilita y vulnera nuestro es-quema constitucional. Además, disiento porque lo resuelto por este Tribunal expone a la Constitución en una situa-ción de interpretación tan laxa como precaria, en perjuicio de la democracia puertorriqueña.
I
El 10 de octubre de 2011, el Senado de Puerto Rico aprobó la Resolución Concurrente Núm. 35, 16ta Asamblea Legislativa, 3ra Sesión Ordinaria (Res. Conc. Núm. 35), con votación de veinte miembros a favor, ocho en contra, uno ausente y dos vacantes. ([1]) Esa resolución concurrente propone múltiples y variadas enmiendas al Art. III de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, con el “propósito único de reestructurar el Poder Legislativo”, debido a que “[e]n las elecciones gene-rales de 2008, el pueblo puertorriqueño avaló el Programa de Gobierno presentado por el Partido Nuevo Progresista *90 [y e]ste Programa incluía un compromiso de realizar una Reforma Legislativa”. (Énfasis suplido). Exposición de Mo-tivos de la Res. Conc. Núm. 35, pág. 1. Posterior a la apro-bación de la Res. Conc. Núm. 35,([2]) el 10 de mayo de 2012 el Senado aprobó la Resolución Concurrente Núm. 60,16ta Asamblea Legislativa, 7ma Sesión Ordinaria, (Res. Conc. Núm. 60) para proponer otra enmienda constitucional, pero a los fines de restringir el derecho a la fianza en par-ticulares circunstancias delictivas. Esta última resolución concurrente incluyó una sección objeto de controversia en este caso, que dispone:
Sección 2.— La enmienda propuesta en esta Resolución Con-currente será sometida para su aprobación o rechazo a los electores capacitados en Puerto Rico en un Referéndum Especial ... conjunto con la consulta para enmendar la Constitución a los fines de cambiar la composición de la Asamblea Legisla-tiva, propuesta en la Resolución Concurrente del Senado Núm. 35, ... la cual reiteramos en la presente Resolución Concurrente. (Énfasis suplido). Id., págs. 11-12.
En síntesis, nuestra labor judicial en el caso de autos se limita a pasar juicio sobre la validez constitucional de la Res. Conc. Núm. 35. Debemos examinar si el tracto legis-lativo para su aprobación cumple con las exigencias proce-sales de la Sec. 1 del Art. VII de la Constitución del Estado Libre Asociado de Puerto Rico. Para atender la interpreta-ción improvisada y errante a la que nos invita el Estado Libre Asociado (peticionario), y que la mayoría de este Foro asume sin justificación plausiva, resulta imperativo aus-cultar si una primera resolución concurrente que no cum-plió con las exigencias procesales para enmendar la Cons-titución, puede ser subsanada con otra resolución concurrente posterior. Veamos.
*91 II
Previo a considerar los asuntos que ocupan nuestra atención, resulta forzoso exponer los alcances interpretati-vos de una controversia constitucional como la de autos. Cómo acercarse a las disposiciones sobre una enmienda constitucional y cómo interpretarlas, resulta una labor ar-dua, pero ineludible a nuestra función constitucional como últimos intérpretes de nuestra Ley Suprema. E.L.A. v. Aguayo, 80 D.P.R. 552 (1958). Esa interpretación, y aquélla hecha a alguna medida legislativa sobre la enmienda cons-titucional, debe ser razonable, según expresa la Opinión mayoritaria al citar al Juez Presidente del Tribunal Supremo de Estados Unidos, señor Roberts. Opinión mayori-taria, acápite XI. Por lo mismo, resulta incongruente que este Tribunal cite la necesidad de interpretaciones razona-bles, cuando el resultado aquí hallado se distancia de ese adjetivo.
Nuestra labor en controversias como la de autos no es juzgar la sabiduría de las enmiendas propuestas, sino eva-luar su constitucionalidad. Berríos Martínez v. Gobernador II, 137 D.P.R. 195, 202 (1994); véase también Córdova y otros v. Cámara Representantes, 171 D.P.R. 789, 801 (2007) (“la Rama Judicial tiene el poder de determinar si las otras ramas del gobierno observaron las limitaciones constitucio-nales y si los actos de una de éstas exceden sus poderes delegados”). Ello es así, puesto que realizar lo contrario contravendría al principio de separación de poderes reco-gido en nuestra Constitución. Const. P.R., Art. I, Sec. 2. En Berríos Martínez v. Gobernador II, supra, pág. 200, nos expresamos sobre este asunto y sostuvimos que:
Al amparo de la facultad que nos otorga el Art. V de la Cons-titución del Estado Libre Asociado, L.P.R.A., Tomo 1, de ser los intérpretes máximos de la Constitución, tenemos el deber de garantizar y vigilar que las enmiendas a nuestra Ley Su-prema cumplan con lo dispuesto en el Art. VII de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1.
*92 Sobre la concepción de lo que es una Constitución y el modo de enfrentarse a ella ante una propuesta de en-mienda, el Informe de la Comisión de Preámbulo, Orde-nanzas y Procedimientos de Enmiendas a la Constitución, sobre Enmiendas que se recoge en el Diario de Sesiones de la Convención Constituyente, expone:
Una constitución, desde luego, es más que una ley ordina-ria, es la ley que gobierna al gobierno. La estabilidad de la constitución es esencial al adecuado desarrollo, dentro de un régimen de ley, de las instituciones y principios que en ella se organizan y establecen. Las constituciones deben estar fuera del alcance de la pasión súbita y el juicio pasajero y, siendo tan alto el fin que ellas cumplen, el procedimiento para enmendar-las debe ser lo suficientemente difícil como para invitar al análisis sereno y cuidadoso. ... Si bien el procedimiento para enmendar la constitución debe ser lo suficientemente rígido para impartirle estabilidad a la constitución y distinguirla de las leyes ordinarias, el procedimiento a su vez debe ser lo su-ficientemente flexible para que la constitución pueda ceder ante una opinión pública informada y consciente y continuar así reflejando los postulados esenciales de vida de la comunidad. (Énfasis suplido). 4 Diario de Sesiones de la Con-vención Constituyente 2559 (1951).
Cuando nos enfrentamos a situaciones complejas y pro-cesos legislativos irregulares sobre una propuesta de en-mienda a la Constitución, nuestra función revisora se toma más significativa y se pone a prueba nuestra capaci-dad de llegar a un resultado que no contravenga los prin-cipios y las disposiciones que encarna la propia Ley Suprema. Para ello, es meritorio que seamos conscientes de la naturaleza de una Constitución y las formas de inter-pretar tanto a la Carta Magna, como a aquellos estatutos que incidan sobre ésta.
Una Constitución es “un acto político y legal ... y en su conjunto expresa más o menos adecuadamente las relacio-nes políticas de una sociedad organizada en un Estado, [además que] fija las estmcturas básicas del aparato esta-tal y funciona como salvaguarda del mantenimiento y de-sarrollo del sistema sociopolitico”. J. Wróblewski, Constitu- *93 ción y teoría general de la interpretación jurídica, Madrid, Ed. Civitas, 2001, pág. 112. La Constitución también se ha definido como “el cauce para que la sociedad se autodirija políticamente, con un ánimo de seguridad jurídica”. P.A. Contreras Matus, Interpretación constitucional: un régi-men especial, 11 Rev. Derecho y Humanidades 311-321 (2005). En la medida en que se permita que se enmiende la Constitución sin que se cumplan a cabalidad las garantías que ella misma expone, se trastoca el carácter de ella como documento que salvaguarda el desarrollo de una sociedad democrática. Ahí estriba la importancia de nuestra función como garantes del cumplimiento del contenido de la Constitución.
La Constitución, pues, es un documento con un poder simbólico originario depositado por los delegados de la Asamblea Constituyente y que nos sigue vinculando en tanto como sociedad depositemos en ella la cohesión de nuestro sistema político-democrático. Para mantener esa seguridad jurídica que simboliza la Ley Suprema, es impe-rativo que nuestra interpretación sobre ella y las leyes que la incidan se enmarque en unos contornos de razonabili-dad, coherencia y sensatez.
Al enfrentarnos al texto magno, como jueces debemos tener presentes varios principios de interpretación constitucional. Ello resulta de gran importancia para evi-tar llegar a conclusiones erradas como parte de metodolo-gías aleatorias, tal cual hizo la opinión mayoritaria en el caso de autos. Así, la doctrina ha elaborado una serie de principios de interpretación constitucional, los que apunta-mos aquí:
a) El Principio de la unidad constitucional—
La interpretación tiene que estar orientada siempre a pre-servar la unidad de la norma primera como punto de partida de todo el ordenamiento jurídico. El texto constitucional debe ser entendido como un sistema dotado de una unidad de sig-nificado en el que cada norma ha de ser interpretada en rela-ción a las demás, de tal manera que se eviten contradicciones *94 con otras normas constitucionales.
b) Principio de armonización o concordancia práctica—
Esto significa que cuando dos o más preceptos constitucio-nales entran en conflicto en la resolución de un caso concreto, debe evitarse la aplicación excluyente de uno en perjuicio de otro.
... Se debe interpretar el texto constitucional de modo que no se produzca el sacrificio de una norma constitucional en aras de otra norma del mismo rango.
c) Principio de la corrección funcional—
El intérprete debe cuidar de respetar el esquema de estruc-turas de poder y de distribución de funciones y tareas entre órganos y entes públicos que consagran la Constitución.
d) Principio de la eficacia normativa—
La interpretación debe tender a maximizar la eficacia de las normas constitucionales, dando preferencia a los puntos de vista que permitan extraer de ellas consecuencias de aplica-ción inmediata.
e) Principio de función integradora—
La Constitución se propone la creación y mantenimiento de la unidad política, entendida como la cohesión de diferentes corrientes de opinión, por tanto, se exige que se prefiera para solucionar los problemas jurídicos constitucionales aquellas interpretaciones que tiendan a mantener dicho propósito.
f) Principio de la fuerza normativa de la Constitución— Aun cuando la interpretación de la Constitución pueda ser muy flexible, hay que partir de que la Constitución es una norma jurídica y no puede por consiguiente perder por vía interpretativa la fuerza normativa, es decir, el valor que como Norma Suprema posee. Contreras Matus, supra, págs. 315-316.
Como veremos más adelante, la opinión que hoy emite este Tribunal ignora cualquier principio y metodología de interpretación constitucional. Así, la Opinión mayoritaria elabora una propia y novedosa interpretación, incurriendo en lo que le criticó al Partido Independentista Puertorriqueño (P.I.P), al decir que su estándar “comes from ... well, from nowhere”. Opinión mayoritaria, acápite VII-B, pág. 32 (citando a la Juez Asociada del Tribunal Supremo de Estados Unidos, Señora Kagan, en Martel v. Clair, 132 S. *95 Ct. 1276, 1285 (2012).([3]) La interpretación constitucional que realiza la opinión emitida y que es avalada por una mayoría de esta Curia es de poco calado, además que cons-tituye un intento de reducir a lo trivial cualquier interpre-tación que se haga sobre la Carta Magna.
III
El Estado Libre Asociado (E.L.A.) nos convida a resolver que el requisito del voto de dos terceras partes del número total de miembros de cada cámara (2/3 x 100 = 66.66%) para proponer enmiendas a la Constitución del Estado Li-bre Asociado de Puerto Rico, Const. P.R., Art. VII, Sec. 1, se refiere únicamente a dos terceras partes de los miembros juramentados y no a la totalidad de escaños existentes. Sostiene su alegación en que, conforme a la definición pro-vista por la más reciente versión del diccionario de la Real Academia Española, el término miembro significa “[i]ndividuo que forma parte de un conjunto, comunidad o cuerpo moral” y que, a su vez, individuo se define como “[p]ersona, con abstracción de las demás”. Alegato de la parte peticionaria, pág. 22. Por lo tanto, arguye que como la Res. Conc. Núm. 35 obtuvo el voto afirmativo de veinte de los veintinueve senadores activos al momento en que se llevó a cabo la votación (20/29 x 100 = 68.96%), ésta satis-fizo el imperativo constitucional. El P.I.P., por su parte, plantea que las dos terceras partes se refieren al número total de escaños existentes en cada cámara. Según este cri-terio, como el Senado se componía de treinta y un escaños *96 al momento cuando se realizó la votación, incluyendo dos vacantes, la medida no obtuvo los votos necesarios para ser aprobada válidamente (20/31 x 100 = 64.51%). El P.I.P. tiene razón.
Con el propósito de auscultar el significado verdadero de la frase “total de los miembros de que se compone cada cámara” utilizada en nuestra Carta Magna, debemos rea-lizar un análisis integrado de la totalidad del documento bajo escrutinio antes de acudir a fuentes exógenas que nada tienen que ver con nuestro ordenamiento jurídico. Cónsono con esta apreciación, vemos que la See. 2 del Art. III de la Constitución presenta urna definición numérica al disponer que “[e]Z Senado se compondrá de veintisiete Senadores y la Cámara de Representantes de cincuenta y un Representantes, excepto cuando esa composición resultare aumentada a virtud de lo que se dispone en la Sección 7 de este Artículo”. (Enfasis suplido). De esta forma, contrario a otras constituciones, la nuestra no fijó un número variable de integrantes de cada cámara,([4]) sino un número fijo: veintisiete en el Senado y cincuenta y uno en la Cámara de Representantes, sujeto a variación únicamente por la aplicación de la See. 7 del Art. III, conocida comúnmente como la Ley de Minorías.([5]) Véase Escuela de Administración Pública U.P.R., La nueva Constitución de Puerto Rico, San Juan, Ed. U.P.R., 2005, pág. 365.
Además, como parte de un análisis integrado y de uni-dad constitucional, para definir las exigencias de la Sec-ción 1 del Artículo VII de la Constitución, notamos que el léxico utilizado en esta sección remite inexpugnablemente *97 al lenguaje del Artículo III, Sección 2. A saber, el Artículo VII, Sección 1, expone que el cálculo se tomará del “número total de los miembros de que se compone cada cámara”, mientras que el Artículo III, Sección 2, define que el “Se-nado se compondrá de veintisiete Senadores”. (Énfasis suplido). De una metodología basada en el propio lenguaje, podemos definir los propósitos depositados en estas cláusu-las de la Constitución, manteniendo así la unidad que ella representa.
Debido a los resultados obtenidos en la última con-tienda electoral, la precitada See. 7 del Art. III, entró en efecto y la composición del Senado de Puerto Rico para este cuatrienio quedó fijada finalmente en treinta y un miembros. Por consiguiente, la Constitución requiere que un mínimo de veintiún Senadores expresen su anuencia mediante voto afirmativo para cumplir con el requisito de dos terceras partes.
Ahora bien, ¿qué sucede cuando surgen vacantes en urna cámara legislativa? ¿Acaso era la intención de nuestros constituyentes que los escaños vacantes fueran excluidos del cálculo a la hora de obtener las dos terceras partes requeridas y que se contaran solo los miembros activos, según plantea el E.L.A.? Un vistazo al Diario de Sesiones de la Convención Constituyente nos convence de que no era esa su intención.
Como bien señala la mayoría, un debate suscitado en la Convención Constituyente entre los delegados don Miguel A. García Méndez y quien posteriormente se convirtiera en Juez Presidente de este Tribunal, don José Trías Monge, arroja luz sobre la respuesta a la incógnita ante nuestra consideración. El Diario muestra que el delegado García Méndez propuso una enmienda para que se robustecieran aún más los requisitos para alterar nuestra Constitución mediante la exigencia de que toda enmienda constitucional fuera aprobada no solo por dos terceras partes del total de miembros de ambas cámaras legislativas, sino, además, *98 por el voto afirmativo de dos terceras partes de los electo-res que participasen en un referéndum. Trías Monge asu-mió un turno en contra de la medida en donde expresó:
... [E]stamos insertando en esta proposición de enmiendas, las garantías esenciales a la estabilidad de la constitución, en cuanto se indica que únicamente podrán proponerse enmien-das a esta constitución mediante resolución concurrente que se apruebe por no menos de dos terceras partes de los miem-bros que componen cada cámara. O sea, el punto fundamental es cuanto a las garantías de limitación en la etapa iniciativa de la enmienda a la constitución. Ahí debidamente reconoce-mos, como se reconoce en 47 constituciones de los estados, que para iniciar una enmienda la Asamblea Legislativa, única-mente podrá hacerse por no menos de dos terceras partes ab-solutas de los miembros que componen las cámaras legislativas. (Enfasis suplido). 3 Diario de Sesiones de la Con-vención Constituyente 1829 (1951).
Con estas palabras Trías Monge aclaró que el requisito de dos terceras partes en la Asamblea Legislativa era lo suficientemente riguroso como para asegurar la estabili-dad necesaria que debe brindarse a toda Constitución, por lo que se hacía innecesario imponer medidas adicionales tan onerosas como requerir también la aprobación de dos terceras partes del voto popular. Acto seguido, la Asamblea Constituyente rechazó la enmienda del señor García Mén-dez, prevaleciendo la postura favorecida por Trías Monge.
La discusión reseñada demuestra que los constituyentes interpretaron el mecanismo de dos terceras partes como una exigencia de difícil cumplimiento que, junto con una simple mayoría de electores, aseguraba la protección de la Constitución contra ataques súbitos y constantes que res-pondieran más al vaivén político cotidiano que a la verda-dera voluntad generalizada de nuestro pueblo. La definie-ron, pues, como dos terceras partes absolutas. En ese contexto, no puede caber duda de que con ello se referían al número total de puestos de que se compondría cada cámara. A la luz de estos pronunciamientos, interpretar lo contrario no sería sensato, pues podría conllevar que una *99 enmienda constitucional fuese aprobada válidamente me-diante el voto afirmativo de un número reducido de legisladores.
Llevado al absurdo, la interpretación del E.L.A. permi-tiría que solo dos legisladores, de tres activos, aprobasen válidamente una propuesta de enmienda constitucional en su cámara, siempre que el resto del cuerpo legislativo es-tuviera vacante; después de todo, el voto de esos dos miem-bros representaría más de dos terceras partes del número total de miembros de que se compondría esa cámara. Evi-dentemente, nuestra Constitución no permite tal absurdo. Además, adoptar la proposición del E.L.A. llevaría a un escenario indeseado, porque dejaría a merced de los pro-pios legisladores definir el “número total de los miembros”, según la conveniencia que persigan. Ello propiciaría a que un grupo de legisladores gestionen la renuncia o el impe-dimento de que se ocupe un escaño vacío, con tal de llegar al número deseado y necesario de las dos terceras partes.
Aparte de lo mencionado, resulta pertinente resaltar que este Tribunal se expresó en torno a la frase “número total de los miembros” según otras secciones del Artículo III que no están hoy en controversia. A esos efectos, en Noriega Rodríguez v. Jarabo, 136 D.P.R. 497, 528-529 (1994), comentamos:
Por mandato constitucional el quorum de la Cámara de Re-presentantes se constituye con una mayoría del número total de los miembros que la componen. ... También, por mandato constitucional, se requiere una mayoría del número total de los miembros que componen el cuerpo para aprobar un pro-yecto de ley. ... Es decir, que si el número total de miembros de la Cámara es de cincuenta y un (51) representantes, excepto cuando dicha composición es aumentada en virtud de las dis-posiciones sobre representación de partidos de minoría, el quorum del Cuerpo se constituye con veintiséis (26) representantes. Así mismo, se requieren los votos de veintiséis (26) Representantes para lograr una mayoría absoluta para la aprobación de un proyecto de ley, resolución conjunta o concurrente. (Enfasis suplido).
*100 Esta misma postura asumimos al evaluar otra disposi-ción constitucional con lenguaje similar. La See. 4, Art. V de la Constitución del Estado Libre Asociado de Puerto Rico dispone que “[n]inguna ley se declarará inconstitucio-nal a no ser por una mayoría del número total de jueces de que esté compuesto el tribunal de acuerdo con esta Constitución o con la ley”. (Enfasis suplido). En Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 392 (1985), reiterando lo que ya habíamos clarificado desde, irónicamente, P.I.P. v. E.L.A., 109 D.P.R. 685 (1980), resolvimos que “[e]n el caso de reclamación de inconstitucionalidad de leyes ... [la Constitución] requiere mayoría absoluta de [los] miembros [del Tribunal Supremo] indistintamente de que hubiese va-cantes, por lo que éstas se sumarían en el número ideal de sus miembros”. (Énfasis en el original suprimido y énfasis suplido). Sánchez Rodríguez, supra, pág. 395. De hecho, esta norma constitucional goza de tal importancia que li-mita igualmente nuestra facultad para declarar inconsti-tucional un reglamento judicial, Ortiz v. Dir. Adm. de los Tribunales, 152 D.P.R. 161 (1980), e impide que confirme-mos una sentencia de inconstitucionalidad dictada por un tribunal de menor jerarquía en caso de que los jueces de esta Curia se encuentren divididos en partes iguales.
A pesar de su pertinencia, sorprendentemente el E.L.A. ni siquiera se expresa sobre nuestros pronunciamientos en estos casos. El peticionario no explica en su alegato por qué debemos interpretar de manera distinta las frases “número total de jueces de que esté compuesto el tribunal”, recogido en la See. 4 del Art. V, supra, de la frase “número total de los miembros de que se compone cada cámara” dispuesto en la Sec. 1 del Art. VII, supra. (Énfasis suplido). La realidad es que no existe razón válida que amerite que adoptemos interpretaciones distintas de frases virtualmente idénti-cas.([6])
*101 Anteriormente hemos expresado que nuestro:
... [O]rdenamiento constitucional requiere que las tres ra-mas reconozcan y respeten los ámbitos constitucionales de cada una. Así pues, la deferencia judicial que le concedemos a la Rama Legislativa y a la Rama Ejecutiva tiene como corola-rio necesario que ellas también tengan la misma deferencia hacia los poderes conferidos por nuestra Constitución a la Rama Judicial, para así evitar que se menoscabe el sistema republicano de gobierno. (Énfasis en el original suprimido y énfasis suplido). Acevedo Vilá v. Meléndez Ortiz, 164 D.P.R. 875, 884 (2005).
Según surge del historial legislativo de la Res. Conc. Núm. 35, antes de aprobarse la resolución se trajo a la discusión del Senado el hecho de que la aprobación de la medida no contaba con el voto de dos terceras partes del número total de miembros que compone la Cámara Alta. LIX (Núm. 13) Diario de Sesiones del Senado de Puerto Rico, 10 de octubre de 2011, págs. 36208-36210 y 36221-36225.([7]) Ante tal reclamo, el argumento se rechazó ha-ciendo abstracción del contenido del Diario de Sesiones de la Convención Constituyente y de nuestros pronuncia-mientos, según acabamos de reseñar. Este proceder de-muestra que el Senado de Puerto Rico no brindó deferencia hacia la Rama Judicial en su interpretación sobre lo que *102 significa “número total de los miembros”, al insistir en dar por aprobada la Res. Conc. Núm. 35. Tal actuación mina nuestro ordenamiento constitucional y sistema republi-cano, porque desvanece el respeto, consideración y deferen-cia entre las tres ramas de gobierno.
Tras discutir y demostrar que la Res. Conc. Núm. 35 no fue aprobada según las exigencias procesales de la Sec. 1 del Art. VII de la Constitución del Estado Libre Asociado de Puerto Rico, debemos examinar si la Res. Conc. Núm. 60 pudo subsanar dicho incumplimiento, defecto o “traspié legislativo”. Opinión mayoritaria, acápite XII, pág. 47.
IV
Según mencionamos, la pregunta de umbral que nos ha-cemos ahora es si la Res. Conc. Núm. 60 puede subsanar un defecto de índole constitucional en la aprobación de la Res. Conc. Núm. 35. Como demostraremos, es jurídica-mente imposible que la constitucionalidad de la Res. Conc. Núm. 35 se sostenga a base de una medida posterior, cuando la resolución anterior nunca llegó a tener vigencia ni existencia jurídica, lo que redunda en una reiteración o validación de la nada, de lo nulo, de lo inexistente. Como jueces, no podemos apostar a entendimientos centrífugos de la sensatez y la coherencia. Todo lo contrario, en ánimos de preservar la independencia judicial, la validez constitu-cional y la legitimidad que tenemos como Tribunal al inter-pretar la propia Constitución, debemos interpretar la Carta Marga y los procesos legislativos concernientes a ella de una manera integrada y armoniosa con la filosofía detrás de la Constitución para mantener vigorosamente la fuerza normativa que la caracteriza.
Desde la creación de la Constitución, ha permeado un espíritu de permitir cambios en ella que se adecúen a las exigencias de nuevos tiempos y realidades, pero sin que esas enmiendas surjan como parte de procesos poco *103 rigurosos. Córdova y otros v. Cámara Representantes, 171 D.P.R. 789, 802 (2007) (“se estableció un procedimiento lo suficientemente rígido como para impartirle estabilidad a la Constitución y distinguirla de las leyes ordinarias. De esta forma, se establecieron límites explícitos al proceso de enmendar la Constitución”); Berríos Martínez v. Gobernador II, supra. La Escuela de Administración Pública de la Universidad de Puerto Rico también había recomendado el mismo principio a la Convención Constituyente: “La tarea de los delegados a la Convención Constituyente es, por lo tanto, redactar una cláusula de enmienda que permita mo-dificar la Constitución de acuerdo con la demanda social de un cambio fundamental y que, sin embargo, evite pueda ser cambiada tan fácilmente como una ley”. La nueva Constitución de Puerto Rico, op. cit., pág. 522.
En este marco ideológico sobre el proceso de enmendar la Constitución, debemos entonces auscultar el proceso le-gislativo en torno a la Res. Conc. Núm. 35 que faculta el referéndum del 19 de agosto de 2012 para enmendar el Art. III de la Constitución.
La opinión que emite este Foro en el día de hoy realiza un acto de omisión de la unidad y de la fuerza normativa que encierra la Constitución. Así, soslaya el marco ideoló-gico que subyace al Artículo VII de la Carta Magna (De las enmiendas a la Constitución), al permitir que un “traspié legislativo” que incumple con dicho Artículo VII tome valor jurídico. En Berríos Martínez v. Gobernador II, supra, pág. 211, expresamos que:
Los límites necesarios al proceso de revisión de una Consti-tución pueden ser explícitos o implícitos. Los primeros constan expresamente en la Constitución; los implícitos son aquellos “cuya existencia sólo puede ser deducida indirectamente, bien como una consecuencia lógica de los presupuestos en que des-cansa el sistema constitucional considerado en su conjunto, bien como correlato de las singulares cualifícaciones que se producen en determinados preceptos de la Constitución”. (Én-fasis suplido y citas omitidas).
*104 Partiendo de este acercamiento a la interpretación de la Constitución, resulta inconcebible la teoría novedosa de la opinión mayoritaria de que una resolución concurrente que verse sobre un asunto particular (limitación de la fianza) pueda reiterar otra resolución concurrente que nunca llegó a tener vida jurídica y que a su vez aborda sobre otro asunto (reforma legislativa). La nueva interpretación de la mayoría sobre las enmiendas a la Constitución parte de la premisa de que una medida legislativa que es nula ab ini-tio por contravenir el requisito constitucional de haber sido aprobada por no menos de dos terceras partes del número total de miembros de cada cámara, puede ser revivida pos-teriormente por un simple “reiteramos”. Se trata de revivir un natimuerto. Esa mayoría ignora que jurídicamente no se puede reiterar o subsanar lo irreiterable o insubsanable porque la nulidad de la Res. Conc. Núm. 35 versa sobre un elemento esencial para su propia existencia. Ergo, la inexistencia de la Res. Conc. Núm. 35 por vicio de incons-titucionalidad no tiene posibilidad de subsanarse y la reso-lución resulta nula ab initio.([8])
*105 La opinión mayoritaria también argumenta que, como la Constitución es silente en cuanto a los requisitos y la definición de una resolución concurrente, el Senado estaba facultado para realizar cualquier gestión la Res. Conc. Núm. 60 para validar la Res. Conc. Núm. 35. Con tal pro-ceder se ignora cualquier principio de interpretación cons-titucional, lacerando así la unidad constitucional y vulne-rando toda garantía de firmeza y estabilidad jurídica en el propio texto magno. Si el espíritu rector detrás del Artículo VII es no permitir enmiendas fáciles a la Constitución, de manera que se “pueda mantener su coherencia, libre de los caprichos momentáneos y arbitrarios de las mayorías”, (én-fasis suplido) Berríos Martínez v. Gobernador II, supra, págs. 210-211, tal cual reconoce la opinión mayoritaria en el acápite VI, entonces nos resulta incomprensible que en esta ocasión el Tribunal permita el inicio de un proceso de enmienda constitucional que contraviene ese espíritu rector y que objetivamente denota ilegalidad. Nos encontra-mos, pues, ante un límite implícito al proceso de enmienda constitucional.
Es cierto que la Constitución no abunda sobre la natu-raleza de una resolución concurrente, sino que simple-mente hace mención a que mediante esa medida legisla-tiva se podrán proponer enmiendas al texto constitucional. No obstante, la falta de definición sobre estas piezas legis-lativas no representa una carta en blanco sobre el proceso de enmienda constitucional, sino que se debe evaluar e in-terpretar en conjunto e integradamente con el resto de la Constitución, preservando siempre el componente ideoló-gico que recogimos previamente en torno a los procesos de enmienda constitucional.
A base de una interpretación integral de las disposicio-nes constitucionales y del espíritu rector sobre las enmien-das a la Carta Magna, debemos concluir que una resolu-ción concurrente que intente enmendar la Constitución debe seguir el mismo rigor de aprobación que establece la *106 Sec. 17 del Art. III, respecto a la regla de un solo asunto. Esa misma exigencia se recogió para las resoluciones con-juntas, al requerirse para su aprobación el mismo trámite de un proyecto de ley. Const. P.R., Art. III, Sec. 18. Resul-taría incongruente con la ideología rigurosa de enmiendas a la Ley Suprema que ante la ausencia de requisitos sobre una resolución concurrente para enmiendas constituciona-les, deba interpretarse que éstas podrán aprobarse me-diante exigencias más laxas que las de una ley o resolución conjunta, cuando las resoluciones concurrentes son la única vía de iniciar un proceso de enmienda constitucional.
A pesar de lo anterior y en el contexto del cuatrienio presente, la aprobación de la Res. Conc. Núm. 60 tampoco cumplió con el Reglamento del Senado, adoptado por la See. 9 del Art. III de la Constitución. Este define las reso-luciones concurrentes como “aquellas medidas aprobadas por ambos Cuerpos, las cuales se utilizan para: a) Propo-ner enmiendas a la Constitución de Puerto Rico; b) Consig-nar expresiones de la Asamblea Legislativa que no tienen carácter de legislación; c) Disponer sobre el gobierno in-terno de la Asamblea Legislativa”. Sec. 17.1 del Regla-mento del Senado de Puerto Rico, R. del S. 27, 16ta Asamblea Legislativa, Ira Sesión Ordinaria, 12 de enero de 2009, pág. 56. Como se puede apreciar, las resoluciones concurrentes se utilizan tanto para asuntos menos trascen-dentales, como para otros de gran envergadura, como urna enmienda constitucional. Conscientes de ello, no podemos caer en la candidez de decir que como estas medidas no tienen fuerza de ley y son expresiones del Poder Legisla-tivo, las resoluciones sobre enmienda a la Constitución se deben analizar e interpretar aisladamente del resto del an-damiaje constitucional, como pretende hacer la opinión mayoritaria.
Además de la definición anterior, el propio Reglamento del Senado regula las resoluciones concurrentes al expre-sar:
*107 Todo proyecto de ley o resolución tendrá un título corto en el cual se expresará en forma clara y concisa el asunto y propó-sito del mismo, de manera que, de la lectura del título se en-tienda el propósito de la medida.
Ninguna medida, con excepción de la del presupuesto general, podrá contener más de un asunto. (Enfasis suplido). See. 15.6 del Reglamento del Senado de Puerto Rico, supra, pág. 50.
Más adelante, continúa:
Las Resoluciones Concurrentes que propongan enmiendas a la Constitución, luego de radicadas, se tramitarán en la misma forma que un proyecto de ley, siendo referidas para su consi-deración y estudio a las Comisiones Permanentes o Especiales que a estos efectos se disponga. Una vez aprobadas dichas Resoluciones Concurrentes serán enviadas al Gobernador, aun cuando éstas no requieren su aprobación, así como a los fun-cionarios concernidos para que éstos procedan a la ejecución de los trámites correspondientes que se establecen en nuestro ordenamiento constitucional y jurídico. (Énfasis suplido). See. 17.3, id., pág. 57.
A base de lo anterior, resulta imperativo llegar a la con-clusión de que el Senado no solo incumplió con los requisi-tos del Art. III y del Art. VII de la Constitución del Estado Libre Asociado de Puerto Rico, sino que también incumplió con los requisitos de su propio Reglamento al aprobar la Res. Conc. Núm. 60 que versa sobre más de un asunto: (1) la enmienda constitucional para limitar el derecho a la fianza y (2) la enmienda constitucional para realizar una reforma legislativa. A modo de silogismo, si el Reglamento del Senado exige que toda resolución concurrente que pro-ponga enmiendas a la Constitución sea aprobada “en la misma forma que un proyecto de ley”, Sec. 17.3 del Regla-mento del Senado de Puerto Rico, supra, y cómo será apro-bado un proyecto de ley se define en el Reglamento del Senado análogamente a como lo hace la Constitución,([9]) es *108 forzoso concluir que toda resolución concurrente que pro-pusiera enmiendas a la Constitución debía ser aprobada como exige la Sec. 17 del Art. III de la Constitución. Como se incumplió con el Reglamento del Senado, con la Sec. 17 del Art. III y el Art. VII de nuestra Ley Suprema, es me-nester que se elimine de la Res. Conc. Núm. 60 el asunto de la reiteración de la Res. Conc. Núm. 35.
Antes de proseguir sobre la importancia de cumplir con los propios reglamentos legislativos, es necesario demos-trar el incumplimiento de la Res. Conc. Núm. 60 con el Reglamento del Senado y la Constitución al versar sobre más de un asunto: la limitación al derecho a la fianza y la reforma legislativa. En Herrero y otros v. E.L.A., 179 D.RR. 277 (2010), tuvimos una controversia en donde nos dimos a la tarea de interpretar la regla de un solo asunto de la See. 17 del Art. III de la Constitución del Estado Libre Asociado de Puerto Rico, supra. Tras brindar un trasfondo histórico sobre la regla de un solo asunto, expusimos que “la cláu-sula se introdujo para prevenir el logrolling”. Id., pág. 292. Acto seguido, indicamos que una de las modalidades más conocidas del logrolling son los riders (“disposiciones de ley no relacionadas con el asunto principal de la legislación, ... que son añadidas o ‘montadas’ en proyectos de ley”. Id., pág. 293). Lo que se promueve con esta regla de un solo asunto es prevenir el logrolling e “impedir la aprobación de leyes con disposiciones que no son advertidas en su título (riders)”. íd., pág. 295.
Asimismo, indicamos en aquel caso que el requisito de un solo asunto debe interpretarse liberalmente, pero “sin dejar de lado el propósito y objetivo de la exigencia constitucional”. Id., pág. 296. Por lo tanto, expresamos que al examinarse la validez de urna ley a la luz de la regla de un solo asunto, es necesario auscultar todas sus disposicio-nes para determinar si éstas se relacionan entre sí y son afines con el asunto que se expresa en su título. Id. Como observamos, en Herrero y otros v. E.L.A. este Tribunal solo *109 mantuvo la misma política liberal en cuanto a la regla de un solo asunto, mas no facultó a la Asamblea Legislativa con una licencia abierta para adoptar medidas con multi-plicidad de asuntos que no sean afines entre sí ni estén comprendidos en el asunto general.
En el caso de autos, la opinión mayoritaria cita a Herrero y otros v. E.L.A., pero sin mucha elaboración solo se limita a comentar sobre la liberalidad de la interpretación de la regla de un solo asunto. Para evaluar la Res. Conc. Núm. 60 a la luz de la regla de un solo asunto, debemos analizar si los asuntos contenidos tienen “una relación ra-zonable, de modo que haya cierto vínculo de inter-dependencia”. íd., pág. 301.
Los asuntos contenidos en esa resolución concurrente son (1) limitación al derecho a la fianza y (2) reiterar la reforma legislativa (See. 2). Su título expresa: “Para propo-ner ... una enmienda a la Sección 11 del Artículo II de la Constitución ... cuyo fin será otorgarle discreción a los jue-ces para conceder o denegar el derecho a permanecer en libertad bajo fianza a los acusados de asesinato cometido [en ciertas circunstancias]”. Res. Conc. Núm. 60, pág. 1. El título no hace mención a la intención de reiterar la Res. Conc. Núm. 35 ni mucho menos abunda sobre realizar una reforma legislativa.
La pregunta que surge es si limitar el derecho a la fianza y la reforma legislativa están comprendidos en un solo asunto general. Diáfanamente surge que el único vín-culo que hay entre estos asuntos es que ambos son un in-tento legislativo para enmendar la constitución el 19 de agosto de 2012. El asunto de la limitación al derecho a la fianza no tiene ninguna relación, ni tan siquiera incidental, con la reforma legislativa, puesto que ésta se puede realizar sin interferir con ese derecho de nuestra Carta de Derechos. Tanto es así, que en las alegaciones del E.L.A. y del P.I.P, ambas partes coinciden en que según la Sec. 1 del Art. VII de la Constitución la proposición de limitación al *110 derecho a la fianza y la proposición de reforma legislativa son dos asuntos separados e independientes. Esto difícil-mente se pueda controvertir por algún Juez o Jueza de este Tribunal. Véase Opinión mayoritaria, acápite VII-B.
Demostrado que son dos asuntos independientes y disí-miles en la Res. Conc. Núm. 60, es innegable que ésta se aprobó en contra de las Secs. 15.6 y 17.3 del Reglamento del Senado y, por consiguiente, en contra de la Sec. 17 del Art. III de la Constitución del Estado Libre Asociado de Puerto Rico. Las implicaciones del rider que se efectuó en la mencionada resolución concurrente, se ejemplifican cla-ramente mediante los votos de una senadora, la Hon. Sila M. González Calderón. La Senadora votó en contra de la Res. Conc. Núm. 35, pero luego votó a favor de la Res. Conc. Núm. 60. Aquí ocurrió lo que se quiso prevenir con la inclusión de la regla de un solo asunto en la Constitución de Puerto Rico: “evitar que se hagan enmiendas extrañas al propósito de los proyectos y que se adultere el fin de un proyecto”. 2 Diario de Sesiones, supra, pág. 896. Bajo la teoría de la mayoría de esta Curia de que la Res. Conc. Núm. 60 reiteró una resolución concurrente anterior que no fue aprobada por no contar con los votos necesarios, entonces se debe contar el voto de la senadora González Calderón como un voto de reiteración, cuando ella eviden-temente se opuso a la Res. Conc. Núm. 35. Sin mayor ex-plicación, aquí hubo logrolling en su modalidad de rider en peijuicio de la Senadora.
Por último, para que un Cuerpo legislativo funcione efi-cientemente, se tienen que obedecer las reglas del propio cuerpo. Noriega Rodríguez v. Jarabo, 136 D.P.R. 497, 533 (1994). No se puede pretender que el Reglamento en cues-tión haya sido aprobado para hacer omisión de sus reglas cuando no convengan al propósito ulterior detrás de al-guna medida legislativa. “ [E]l Presidente de [una] Cámara ... no puede obviar o ignorar las limitaciones jurídicas que puedan existir aun sobre los poderes de gobierno interno *111 de su Cámara. Y es al Tribunal Supremo a quien le corres-ponde aclarar los contornos de tales poderes”. Acevedo Vilá v. Meléndez Ortiz, supra, pág. 937 (Op. Disidente J. Fuster Berlingeri). Es por ello que esta Curia viene obligada a exigirle al Senado a que cumpla con su propio Regla-mento.([10]) Lástima que una mayoría de este Foro abdique a tal obligación.([11])
V
Es en controversias como la de autos, donde el proceso legislativo para enmendar la Constitución estuvo marcado por irregularidades insubsanables, cuando los integrantes de este Tribunal vienen llamados a ejercer celosamente su deber de preservar la unidad constitucional y su poder normativo. Nuestro compromiso con defender la Constitu-ción se extiende a evitar hasta la apariencia de que este Tribunal se invista como adlátere del “traspié legislativo” que mancilla el proceso democrático de enmienda a la Constitución.
Disiento del proceder de la mayoría de esta Curia por-que, según lo aquí demostrado, las medidas legislativas que promueven el proceso de enmienda constitucional no *112 cumplieron con los requisitos básicos para iniciar ese proceso. Avalar los dislates legislativos en procesos que, por su naturaleza cimera, deben guardar la mayor serie-dad y pulcritud, nos convierte en cómplices de tan desati-nado proceder de ofensa constitucional.
Por las razones esbozadas, declararía inconstitucional la Res Conc. Núm. 35 e inválido el intento de reiterar esa resolución por medio de la Res. Conc. Núm. 60. Por consi-guiente, y bajo la mácula de inconstitucionalidad del pro-ceso de enmienda a la Constitución para lograr una re-forma legislativa, ordenaría paralizar la consulta al Pueblo sobre enmiendas al Artículo III de la Constitución del Es-tado Libre Asociado de Puerto Rico, que ha de celebrarse mediante referéndum el próximo 19 de agosto de 2012. Al llegar a esta conclusión resulta improcedente e innecesario expresamos sobre los requisitos sustantivos de la Sección 1 del Artículo VII de la Constitución, en cuanto al asunto del número de proposiciones de enmienda en el mismo referéndum. Igualmente, resulta innecesario expresarnos sobre el asunto de la publicidad de las medidas legislativas en cuestión, puesto que tras una declaración de inconstitu-cionalidad, ello sería inconsecuente.

(1) El proceso de aprobación de la Res. Conc. Núm. 35 en la Cámara de Repre-sentantes de Puerto Rico no está en controversia, por lo que se omite en esta opinión.

(2) Es de notar que la Res. Conc. Núm. 35 se aprobó con la oposición de los senadores de minoría, que objetaron la ausencia del voto de dos terceras partes del total de miembros que componen el Senado. Véase LIX (Núm. 13) Diario de Sesiones del Senado de Puerto Rico, 10 de octubre de 2011, págs. 36208-36210 y 36221-36225.

(3) Huelga aclarar que no toda idea o teoría innovadora está destinada a la incorrección o al fatalismo innato, puesto que toda teoría o doctrina tiene un co-mienzo al que no le precedió nada. No obstante, al elaborar una teoría interpretativa sobre los alcances de la Constitución, se debe realizar en armonía con la propia Constitución y la concepción ideológica que emana de ella y se ha elaborado en torno a ella. Además, debe hacerse en conjunto con otros acercamientos e interpretaciones que sobre esa Ley Suprema se hayan hecho. Evidentemente, la opinión que suscribe la mayoría de este Foro se distancia diametralmente de estos principios básicos de interpretación constitucional.

(4) El ejemplo más evidente de este tipo de sistema se encuentra en la See. 3 del Art. I de la Constitución de Estados Unidos, la cual estableció originalmente un esquema proporcional de un Representante por cada treinta mil habitantes.

(5) En síntesis, la Ley de Minorías dispone una fórmula de aumento de escaños legislativos para “[c]uando en una elección general resultaren electos más de dos terceras partes de los miembros de cualquiera de las cámaras por un solo partido o bajo una sola candidatura”. Const. P.R., Art. III, Sec. 7, L.P.R.A., Tomo 1, ed. 2008, pág. 384. Como parte de esa fórmula, limitó el número de legisladores añadidos a nueve en el Senado y diecisiete en la Cámara de Representantes. íd.

(6) Es de reseñar que durante la vista oral del caso de autos celebrada en este Tribunal el 27 de junio de 2012, se discutió el alcance de la frase “número total de ...” *101 de los Arts. V y VII de la Constitución, L.P.R.A., Tomo 1. Tras exponer nuestra interpretación en Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 392 (1985), se le cuestionó al Ledo. Eliezer Aldarondo Ortiz, representante del Estado Libre Asociado de Puerto Rico, si el peticionario proponía una interpretación distinta para el proceso de enmienda a la Constitución vis-á-vis a la interpretación que esta Curia ha dado a la See. 4 del Art. V de la Constitución, L.P.R.A., Tomo 1, por lo que se proponían dos interpretaciones distintas para textos idénticos en una misma Constitución. A estas preguntas, el licenciado Aldarondo Ortiz respondió que sí. Transcripción de Evidencia de la Vista Oral, págs. 32 y 34.

(7) Cabe mencionar que en esa sesión senatorial igual se trajeron a colación las disposiciones del Mason’s Manual of Legislative Procedure, manual de procedimiento parlamentario que usa la National Conference of State Legislatures, en donde par-ticipa el Senado de Puerto Rico. Diario de Sesiones del Senado, supra, págs. 36221-36222. El Mason’s Manual dispone en la Sección 512.4: “Where a constitution, charter, or controlling provision of law requires a two-thirds vote of all members, a vote less than that number, although two-thirds of a quorum, is not sufficient. Even though there are vacancies, a vote equal to two-thirds of the total membership is required”. P. Manson, Mason’s Manual of Legislative Procedure, Denver, Ed. Thomson Reuters, 2010, Sec. 512.4.

(8) Independientemente se hable de reiterar o de ratificar, como surgió en la discusión de la Vista Oral del 27 de junio de 2012, Transcripción de Evidencia de la Vista Oral, págs. 52-54, el resultado sería el mismo.
Por un lado, “[a]l indagar sobre la definición de ‘ratificar’ encontramos que se refiere al acto de ‘aprobar o confirmar actuaciones, palabras, opiniones, decisiones, decretos y reglamentos, dándolos por legales, valederos y ciertos’ ”. (Cita omitida, énfasis en el original suprimido y énfasis suplido). Córdova y otros v. Cámara Representantes, 171 D.P.R. 789, 804 esc. 8 (2007), Partiendo de esta definición, si se rati-ficara la Res. Conc. Núm. 35, se daría por legal, valedera y cierta una medida que no contó con las exigencias constitucionales, por lo que se daría por válido lo inválido, creando un desconcierto jurídico inaudito.
En la alternativa, si nos refiriéramos al vocablo reiterar, la opinión mayoritaria señala que éste significa “volver a decir o a hacer algo”. Real Academia de la Lengua Española, Diccionario de la lengua española, 22da ed., Madrid, Ed. Espasa-Calpe, 2001, T. II, pág. 1934. Lo que soslaya la opinión de esta Curia al utilizar una fuente extrajurídica que no alcanza a arrojar luz sobre esta controversia, es que reiterar puede significar volver a decir o a hacer algo correcto, como algo incorrecto, ya que el diccionario utilizado no delimita el vocablo a la naturaleza correcta de lo dicho o hecho. Partiendo de esta premisa, reiterar la Res. Conc. Núm. 35, después de que fue aprobada inválidamente, como concluye la Opinión mayoritaria en el acápite VII-B, no tiene otro significado que volver a decir o a hacer el acto inválido o inconstitucio-nal que se hizo previamente. En otras palabras, reiterar la invalidez reproduce invalidez.

(9) “No se aprobará ningún proyecto de ley, con excepción de los de presupuesto general, que contenga más de un asunto, el cual deberá ser claramente expresado en su título, y toda aquella parte de una ley cuyo asunto no haya sido expresado en el título será nula”. Const. P.R., Art. III, Sec. 17.

(10) Cónsono con lo anterior, hemos manifestado que:
“[E]n nuestra jurisdicción hemos acogido la doctrina de deferencia judicial a la adopción e interpretación por parte de las cámaras legislativas de sus reglas y procedimientos. Sin embargo, ello no significa que dichos procesos y reglamentos sean inmunes a una intervención judicial, pues este Tribunal no puede abdicar a su responsabilidad de determinar si tales actos legislativos se enmarcan dentro de los poderes constitucionales facultados”. Acevedo Vilá v. Meléndez Ortiz, 164 D.P.R. 875, 891 (2005).

(11) Resulta pertinente señalar que el Reglamento del Senado pudo haber sido enmendado el mismo día de la sesión en que se aprobó la Res. Conc. Núm. 60, para así alterar las secciones que incidían sobre la aprobación de esa resolución concurrente. Tal fue el argumento certero de la Jueza Asociada Señora Pabón Charneco en la vista oral celebrada en este Tribunal. Transcripción de Evidencia de la Vista Oral, pág. 47. Sin embargo, esas enmiendas no se realizaron y la Res. Conc. Núm. 60 se aprobó con el Reglamento, según hemos citado. Por supuesto, de haberse propuesto enmiendas al Reglamento o suspensiones de algunas disposiciones, éstas debían hacerse conforme las Secs. 2.1 y 2.2 de ese cuerpo reglamentario: con el voto afirmativo de no menos de la mayoría absoluta del total de miembros del Senado.